# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
April 30, 2002 Session Heard at Jefferson City[1]

## TIMOTHY LEE KENDRICK v. JUDY KENDRICK SHOEMAKE

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Chancery Court for Hamilton County**
**No. 69033     William M. Dender, Special Chancellor**

---

**No. E2000-01318-SC-R11-CV - Filed November 1, 2002**

---

We granted this appeal to determine the proper standard to apply to a petition to modify custody when both parents are parties. We hold that a trial court may modify an award of child custody when both a material change of circumstances has occurred and a change of custody is in the child's best interests. We hold that the preponderance of the evidence does not support the trial court's ruling that a material change of circumstances has occurred. We therefore do not address the second inquiry–whether a change of custody is in the child's best interests. The judgment of the Court of Appeals is affirmed, as modified, and the case is remanded to the trial court for proceedings consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed as Modified; Case Remanded**

JANICE M. HOLDER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON and WILLIAM M. BARKER, JJ, joined. ADOLPHO A. BIRCH, JR., J., filed a concurring and dissenting opinion.

Glenna M. Ramer, Chattanooga, Tennessee, for the appellant, Timothy Lee Kendrick.

Harold L. North, Jr. and Robert D. Philyaw, Chattanooga, Tennessee, for the appellee, Judy Kendrick Shoemake.

---

[1]Oral argument was heard in this case on April 30, 2002, in Jefferson City, Jefferson County, Tennessee, as part of this Court's S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

# OPINION

## PROCEDURAL HISTORY

Timothy Kendrick ("Mr. Kendrick") and Judy Kendrick Shoemake ("Mrs. Shoemake") were married on April 25, 1981. Two children were born of the marriage, Kelli Faye Kendrick, born on November 24, 1981, and Jordan Lee Kendrick, born on April 8, 1986. Jordan, who is the subject of this custody dispute,[2] has been developmentally delayed since birth and has had difficulty walking and communicating.

Mr. Kendrick and Mrs. Shoemake divorced in October of 1990. Pursuant to the Marital Dissolution Agreement ("MDA") incorporated into the final decree of divorce, Mrs. Shoemake received custody of the children. Mr. Kendrick was to have visitation every other weekend. In 1992, Mrs. Shoemake married Sammy Shoemake ("Mr. Shoemake"). Mr. Shoemake had been married to Tuesday Bradley ("Ms. Bradley") prior to his marriage to Judy Kendrick Shoemake.[3] In 1993, Mr. Kendrick married Jacqueline Schulten ("Ms. Schulten").

On February 23, 1998, Mr. Kendrick filed an emergency petition seeking custody of his two children. The petition alleged, *inter alia*, that "much upheaval and discontent [exist] in [Mrs. Shoemake's] home," that Mrs. Shoemake "has been absent from her home all night," and that Mr. and Mrs. Shoemake "have engaged in repeated and verbally hostile and profane arguments in front of [Kelli and Jordan Kendrick]." Mr. Kendrick attached the affidavit of Ms. Bradley, which attested to the facts alleged in the petition. The trial court awarded temporary custody to Mr. Kendrick by *ex parte* order on the day the petition was filed. Mrs. Shoemake requested an immediate hearing, which the trial court granted. On February 27, 1998, the trial court set aside the award of temporary custody to Mr. Kendrick, and the parties agreed to submit their custody dispute to mediation.

The mediation proved unsuccessful. On May 29, 1998, Mrs. Shoemake filed an answer denying the allegations in Mr. Kendrick's petition. She also filed a counter-petition seeking child support arrearages and reimbursement for Jordan's medical expenses and costs necessary to repair the marital home. The trial court held a hearing on July 1, 1999, on the petition to modify custody.[4]

At the close of proof, the trial court postponed a ruling in the case so that the parties could have a final opportunity to determine which arrangement would be in Jordan's best interests. The trial court reconvened on September 3, 1999, after the parties were unable to resolve the issue. The trial court granted Mr. Kendrick's petition for modification of custody. The trial court failed to make

---

[2]Kelli has since reached the age of majority, and the subject of her custody is no longer at issue.

[3]Mr. Shoemake and Ms. Bradley had two children during their marriage.

[4]The trial judge who initially presided over the case recused himself on his own motion after Ms. Schulten was elected a judge of the Hamilton County Circuit Court. Pursuant to Tennessee Supreme Court Rule 11, this Court designated William M. Dender, a retired judge, to preside over the matter as Special Chancellor.

any specific factual findings, but only stated generally that circumstances had changed warranting a modification of custody. With regard to the material change in circumstances, the court stated:

> Let me say that, that clearly I think the circumstances surrounding this child have changed; I think the circumstances surrounding the families, that is of the mother and of the father have changed. And I think the medical needs of this child have changed. And I find that it is essential that I look to the best interest[s] of the child here especially. And, of course, that is always the criteria by which you decide custody, but it is especially true in this case.

The trial court did not specify the changes in circumstances that were found or explain why it believed that placing Jordan in the custody of Mr. Kendrick would be in Jordan's best interests. A final order reciting only the details of the new custody arrangement was filed on May 10, 2000.

Mrs. Shoemake appealed to the Court of Appeals. The intermediate appellate court reversed the judgment of the trial court, holding that a change in custody is not justified unless the change is necessary to prevent substantial harm to the child and that Mr. Kendrick failed to show Jordan would suffer substantial harm absent a change of custody.

We granted permission to appeal to determine the proper standard to be used when modifying an award of child custody when both parents are parties. We hold that a trial court may modify an award of custody when both a material change of circumstances has occurred and a change of custody is in the child's best interests. On the facts of this case, we find that Mr. Kendrick has not shown a material change in circumstances. Therefore, we affirm the judgment of the Court of Appeals leaving custody of Jordan with Mrs. Shoemake.

## STANDARD OF REVIEW

We review the trial court's conclusions of law "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." S. Constructors, Inc. v. Loudon County Bd. of Educ., 58 S.W.3d 706, 710 (Tenn. 2001). Furthermore, our review of the trial court's findings of fact is de novo upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); Hass v. Knighton, 676 S.W.2d 554, 555 (Tenn. 1984); see also Nichols v. Nichols, 792 S.W.2d 713, 716 (Tenn. 1990). When the trial court makes no specific findings of fact, however, we must review the record to determine where the preponderance of the evidence lies. Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997).

# ANALYSIS

## I. Proper Standard

The principal issue in this case concerns the proper standard to be applied to a petition to modify custody from one parent to the other parent. This issue is largely resolved by our recent decision in <u>Blair v. Badenhope</u>, 77 S.W.3d 137 (Tenn. 2002).[5] <u>Blair</u> involved a custody dispute between a parent and a non-parent. We concluded that once a valid order of custody has been issued, subsequent custody modification proceedings should apply the "standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred, which makes a change in custody in the child's best interests." <u>Id.</u> at 148. As explained in <u>Blair</u>, the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. <u>Id.</u> at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." <u>Id.</u> (citations omitted). We note that a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well-being.

If a material change in circumstances has occurred, it must then be determined whether the modification is in the child's best interests.[6] This determination should be made according to the factors enumerated in Tennessee Code Annotated section 36-6-106.[7]

---

[5]Effective July 15, 2002, an enactment of Tennessee's General Assembly defines the proper standard for modifying custody from one parent to the other parent. Act of June 30, 2002, 2002 Tenn. Pub. Acts 859 (providing that a material change in circumstances must be shown in order to modify custody)(to be codified at Tenn. Code Ann. § 36-6-101(a)(2)(B)). In his concurring and dissenting opinion, Justice Birch criticizes this standard and expresses his preference for a "substantial harm" standard for modifying child custody. The General Assembly, however, recently rejected the substantial harm standard , stating that "[a] material change of circumstance does not require a showing of a substantial risk of harm to the child." <u>Id.</u>

[6]In his concurring and dissenting opinion, Justice Birch criticizes the best interests analysis as "inherently unfair" due to its "loose definitional structure." A majority of this Court has concluded that a best interests analysis, including the factors set forth in Tenn. Code Ann. § 36-6-106, should be used to determine the propriety of a modification of child custody. This analysis is consistent with the best interests analysis required by the legislature in initial child custody determinations. Tenn. Code Ann. § 36-6-106. Any unfairness of this standard, which we do not concede, is best directed to the legislature.

[7]These factors set forth in section 36-6-106 include the following:
      (1)     The love, affection and emotional ties existing between the parents and child;
      (2)     The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
      (3)     The importance of continuity in the child's life and the length of time the child has

(continued...)

## II. Application of the Proper Standard in this Case

Having decided the appropriate standard to be applied when determining whether a modification of custody is warranted, we must now apply the standard to this case. The trial court failed to specifically identify any changed circumstances that warrant a change of custody. Furthermore, the trial court did not conduct an analysis of the best interests of the child. This failure to set forth supporting findings of fact has made our task of reviewing the decision more difficult. Without specific findings of fact, we cannot know upon which facts the trial judge relied in entering the judgment or the reasons underlying the court's ruling. Mr. Kendrick, however, has identified five purported changes in circumstances affecting the child's well-being in a meaningful way, which he maintains justify a modification of custody:[8] (1) that Mrs. Shoemake's work schedule on third shift adversely affects Jordan's welfare; (2) that Mrs. Shoemake's attention to Jordan's education has not been sufficiently aggressive and that she is incapable of meeting his educational needs; (3) that a tumultuous marital relationship between Mrs. Shoemake and her husband adversely affects Jordan's well-being; (4) that Mrs. Shoemake lacks sound judgment with respect to Jordan's medical care; and (5) that Mrs. Shoemake has a general tendency to subordinate the needs of her children to her own, which adversely affects her children's welfare. We examine each of these circumstances in turn.

### *Mother's Work Schedule*

Mr. Kendrick asserts that a material change in circumstances has occurred based upon Mrs. Shoemake's employment on the third shift at McKee Foods. Since the original award of custody, Mrs. Shoemake has begun working the night shift, between the hours of 10:00 p.m. and 6:00 a.m. Mrs. Shoemake testified that the primary reason she decided to work the night shift was to spend more time with Jordan during the day. She stated that her work schedule enables her to help Jordan

---

[7](...continued)

lived in a stable, satisfactory environment; . . . .

    (4)      The stability of the family unit of the parents;

    (5)      The mental and physical health of the parents;

    (6)      The home, school and community record of the child;

    (7)      The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

    (8)      Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . . .

    (9)      The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

    (10)      Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

[8]It is clear that the changes alleged by Mr. Kendrick occurred after the entry of the initial order of custody and were not known or could not have been reasonably anticipated when the initial order was entered. See Blair v. Badenhope, 77 S.W.3d 137, 150 (Tenn. 2002).

in the afternoons when he returns from school. She also testified that either she or Mr. Shoemake is able to be at home with Jordan because she works at night.[9] Accordingly, we conclude that the preponderance of the evidence fails to show a material change in circumstances has occurred based upon Mrs. Shoemake's employment schedule.

*Mother's Attention to Her Child's Educational Needs*

Mr. Kendrick next asserts that a material change in circumstances has occurred since the decree because Mrs. Shoemake has not fully met Jordan's educational needs. In support of his claim that Mrs. Shoemake has been neglecting Jordan's educational needs, Mr. Kendrick introduced the testimony of Anne Kennedy, one of Jordan's teachers during the 1995-1996 school year. She testified that Mrs. Shoemake was "aloof" and not as communicative with her as was Mr. Kendrick. Mr. Kendrick also introduced evidence that he is very involved in Jordan's education and has been instrumental in ensuring Jordan's development. He has attended most of Jordan's M-Team meetings.[10] Despite the terms of the MDA, Mr. Kendrick has had visitation with Jordan almost every weekend. Mr. Kendrick further testified that he works closely with Jordan's teachers during the school year to develop a structured curriculum for his son.

Ms. Schulten testified that when she first met Jordan in 1991, he was four years old, still drank milk from a baby bottle, ate only oatmeal, wore diapers, and possessed a very limited vocabulary. Ms. Schulten and Mr. Kendrick were instrumental in procuring from the Hamilton County school system an "augmentative communication device" known as the "Liberator" to assist Jordan in developing his communication skills. The record indicates that Jordan's communication skills have vastly improved since he began using the Liberator. He has also developed computer skills.

Mrs. Shoemake, however, testified that she has been an active participant in Jordan's classes, serving as a homeroom mother and also taking part in Jordan's M-Team meetings. She encourages him to read and write at home, and Mr. Shoemake helps Jordan every night with his homework assignments. Mrs. Shoemake also pursued speech therapy for Jordan at one point, though the sessions have since been discontinued, apparently due to a lack of progress.

The record shows that Mr. Kendrick and Mrs. Shoemake have each taken an active role in Jordan's education. As a result of these efforts, Jordan has been a good student, has enjoyed attending school, and has shown demonstrable improvement. There is no indication, however, that Jordan's educational and developmental well-being has been adversely affected by Mrs. Shoemake or her husband. We conclude, therefore, that the preponderance of the evidence fails to show that

---

[9]Mr. Shoemake is also employed by McKee Foods. He, however, works the first shift.

[10]"M-Team" meetings are multidisciplinary team meetings during which programs for handicapped students are planned.

a material change in circumstances has occurred based upon Mrs. Shoemake's attention to Jordan's educational needs.

*Child's Home Environment and Mother's Marriage*

Mr. Kendrick next asserts that a material change in circumstances has occurred because the marital relationship between Mrs. Shoemake and her husband has become increasingly unstable, thereby adversely affecting Jordan's well-being. As evidence of the Shoemakes' marital instability, Mr. Kendrick relies upon the affidavit of Mr. Shoemake's ex-wife, Ms. Tuesday Bradley, in which she alleged that the Shoemake household was in a state of "verbal turmoil," with "screaming at the children in the home and the use of profanity directed at the children." The affidavit further alleged that Mrs. Shoemake has "been absent from the home overnight [and] has been frequenting bars and neglecting her children." Finally, Ms. Bradley alleged that Mrs. Shoemake's "conduct has caused great distress to the children in that home."

If the assertions in Ms. Bradley's affidavit are true, then a material change in circumstances may exist. The collapse of the custodial parent's home environment is a material change in circumstances that may affect the well-being of any child within that environment. As such, a change in custody to a more stable environment could be in the child's best interests.

Mr. and Mrs. Shoemake, however, denied the assertions contained in Ms. Bradley's affidavit.[11] Furthermore, the evidence in this case does not preponderate in favor of a finding that the state of the Shoemake marriage is at the threshold of dissolution. During her testimony Ms. Bradley provided no support for many of these assertions. For instance, Ms. Bradley stated that she knew of arguments between Mr. and Mrs. Shoemake. She testified, however, that she could not recall any one disagreement specifically. When asked about the verbal fights in front of the children, Ms. Bradley again testified that she could recall no specific incident. Nor could Ms. Bradley recall the conduct of Mrs. Shoemake that "caused great distress to the children in that home." Finally, contrary to the assertions in her affidavit, Ms. Bradley testified that she possessed no first-hand knowledge that Mrs. Shoemake had been absent from her home, had visited any bars, or had otherwise neglected her children. We therefore afford very little weight to Ms. Bradley's accusations.

Ms. Bradley did insist that Mr. Shoemake used profane language in telephone conversations with her and that, during one conversation, he directed this language toward one of his children. A verbally abusive pattern of similar conduct directed at a child may affect the child's well-being. Ms. Bradley asserted that Mr. Shoemake often spoke to her this way because they were unable to communicate properly. Ms. Bradley, however, could not cite any other example of any similar conversations or conduct occurring in the presence of any child.

---

[11]Mrs. Shoemake did acknowledge taking two overnight trips with various friends, but she testified that the children were left in the care of Mr. Shoemake and her sister. She denied taking any other overnight trips.

Several witnesses, however, testified that they have never seen inappropriate behavior from the Shoemakes toward their children. Further, the record shows that Jordan and Mr. Shoemake developed a close relationship, and two witnesses testified that they enjoy a father and son relationship. Mr. Shoemake testified that Mr. Kendrick and his mother have personally thanked Mr. Shoemake on separate occasions for "being such a good parent" to Jordan.

Moreover, there is evidence that Mrs. Shoemake has been a caring mother for Jordan. Mrs. Shoemake's sister testified that Jordan is "quite dependent upon [Mrs. Shoemake] for emotional support and reassurance," and at least three witnesses observed that Mrs. Shoemake and Jordan enjoy a very close bond. We find little support in the record for the assertion that the Shoemake household is in such a constant state of turmoil that Jordan's well-being has been adversely affected. Accordingly, we cannot conclude that the preponderance of the evidence shows that a material change in circumstances has occurred in the Shoemake household.

*Mother's Judgment Regarding Her Child's Medical Care*

Mr. Kendrick asserts that a material change in circumstances has occurred in that, since the decree, Mrs. Shoemake has failed to exercise sound judgment with respect to Jordan's medical needs. Mr. Kendrick cites an incident occurring in 1998 when Mrs. Shoemake had scheduled surgery for Jordan to correct problems with his feet. Mr. Kendrick was not consulted in the decision and learned of the planned surgery from his daughter. After asking Mrs. Shoemake to forgo the surgery, which she refused to do, Mr. Kendrick obtained an injunction to prohibit Mrs. Shoemake from seeking any "unauthorized, elective surgery" for Jordan.

At the hearing in this case, Mrs. Shoemake testified that she sought the surgery because Jordan's flat feet were causing him pain. She stated that she initially consulted a podiatrist who had successfully performed surgery on her own feet. This podiatrist referred her to another podiatrist in Atlanta who was allegedly more experienced in these types of surgeries.

Dr. Christine Parker, Medical Director of Memorial Health Services and Memorial Hospital, testified that this elective surgery should not have been considered without first obtaining a second opinion. She further stated that while she did not personally know what kind of surgery would have been performed, she was nevertheless concerned that no one in the Chattanooga area could confirm the qualifications of the Atlanta podiatrist.[12]

The record, however, does not support the blanket assertion that Mrs. Shoemake has neglected Jordan's medical needs or that she lacks sound judgment in this area. We agree that the mother probably should have sought a second opinion. Absent this incident, however, the record

---

[12]In his affidavit supporting his request to enjoin Jordan's surgery, Mr. Kendrick stated that Dr. Parker's opinion was that "a podiatrist is not qualified to perform this type of surgery." However, Dr. Parker did not testify to this point at the hearing, and we agree with the conclusion of the Court of Appeals that "[i]n view of her admitted ignorance regarding the nature of the surgery, we question whether Dr. Parker would have had adequate information to form an opinion as to [the] consequences were the surgery to be performed unsuccessfully."

shows that Mrs. Shoemake generally has been a responsible parent in caring for Jordan's medical needs. She obtained braces for Jordan, both orthopedic and orthodontic, and has taken him to the orthodontist periodically. She had Jordan tested for reactions to allergens and has sought and obtained medicine for his allergy conditions. She also has sought physical therapy sessions for him; and, for a period of time, she took him to speech therapy sessions. She has maintained health insurance for the children since the divorce in 1990. As such, we cannot conclude that the preponderance of the evidence shows that a material change in circumstances has occurred with regard to Mrs. Shoemake's medical care of Jordan.

### *Mother's Attention to Her Child's Interests*

Finally, Mr. Kendrick asserts that a material change in circumstances has occurred because Mrs. Shoemake has demonstrated that she tends to subordinate the interests of her children to her own interests. In support of this proposition, Mr. Kendrick introduced a letter written by Mrs. Shoemake and published by a Chattanooga newspaper alleging that Ms. Schulten "has hurt [the Shoemakes'] family." More specifically, the letter (1) alleged that Ms. Schulten sought temporary custody of her children in violation of Tennessee law; (2) accused Ms. Schulten of "using" Jordan and Kelli to promote her campaign for circuit court judge; and (3) alleged that Mr. Kendrick stopped paying child support after Ms. Schulten, as Mr. Kendrick's lawyer and wife, told him to stop paying. Mr. Kendrick argued that Mrs. Shoemake ignored Kelli's pleas not to send this letter, thereby evidencing Mrs. Shoemake's tendency to disregard the interests of her children in favor of her own.

We disagree that this incident shows that Mrs. Shoemake has a general tendency to subordinate the interests of her children to her own. While the testimony does show that Kelli suffered much embarrassment as a result of the publication of this letter, the record does not show how this incident affected Jordan's well-being. One incident of poor judgment on the part of Mrs. Shoemake is insufficient to support Mr. Kendrick's broad proposition. We cannot conclude, therefore, that the preponderance of the evidence shows a material change in circumstances.

Having determined that no material change in circumstances has occurred in this case, we need not address whether a change in custody is in Jordan's best interests.

### CONCLUSION

We hold that a trial court may modify an award of custody from one parent to the other parent when both a material change of circumstances has occurred and a change of custody is in the child's best interests. In this case, the trial court made no findings of fact as to any specific changes in circumstances that would warrant a change in custody. Upon our review of the record, we conclude that the preponderance of the evidence does not support the trial court's ruling that a material change in circumstances has occurred. We therefore need not address whether a change of custody would be in the child's best interests. The judgment of the Court of Appeals is affirmed, as modified, and the case is remanded to the trial court for proceedings consistent with this opinion.

Finally, we note that the Court of Appeals remanded this case to determine "the amount of expenditures made by Father on behalf of the children for necessaries not provided by Mother between the establishment of the Temporary Parenting Plan on February 28, 1998, and the announcement of the trial court's judgment on September 3, 1999." The intermediate court also ordered that the payments for these expenses be used to offset the child-support arrearages owed by Mr. Kendrick. We agree that a remand for these purposes is appropriate, but we further instruct the trial court to award an appropriate amount of current child support to Mrs. Shoemake, for the benefit of Jordan Kendrick, based upon the Tennessee Child Support Guidelines. Costs of this appeal are taxed to the appellant, Timothy Lee Kendrick, for which execution may issue if necessary.

_____
JANICE M. HOLDER, JUSTICE