# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 8, 2003 Session

## GEOFFREY E. GILMORE v. MARSHA K. MANGRUM

**Appeal from the Chancery Court for Sumner County**
**No. 94D-497     Thomas E. Gray, Chancellor**

---

**No.  M2002-02171-COA-R3-CV - Filed July 29, 2003**

---

This case involves an issue of change of primary residential custody of a minor child from one parent to another.  Mother currently has primary residential custody.  The child at issue was sexually molested by his step-brother at his Mother's residence.  Father filed a petition requesting custody be changed from Mother to him.  Although the trial judge found a material change of circumstances, he did not find a change of custody to be in the child's best interest and denied Father's Petition. We affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and ROYCE TAYLOR, SP. J., joined.

C. Ronald Blanton, Hendersonville, Tennessee, for the appellant, Geoffrey E. Gilmore.

Arthur E. McClellan, Gallatin, Tennessee, for the appellee, Marsha K. Mangrum.

### OPINION

The facts of this case are very simple and virtually uncontested.  The parties, Geoffrey Gilmore (Plaintiff/Appellant) and Marsha Mangrum (Defendant/Appellee), were divorced in 1995 and share joint legal custody of their son D.G., with Ms. Mangrum having primary residential custody.  Ms. Mangrum subsequently married Jerry Mangrum, who also has a minor son.  Her husband's son does not live with Mr. and Mrs. Mangrum, but he has visitation with his father at the Mangrum household on a regular basis.

In August of 2000, D.G. was sexually abused by Mr. Mangrum's son.  When Mrs. Mangrum discovered what had happened to her son, she immediately filed a police report, contacted the

Department of Children's Services (DCS), and prevented any further contact between D.G. and Mr. Mangrum's son. However, she did not inform Mr. Gilmore of the incident.[1]

After contacting DCS, the case worker, Amy Burk, met with Mrs. Mangrum and D.G. regarding the incident. DCS then enacted a safety plan which included a recommendation of no contact between the children until released by their individual counselors and separate counseling for both children. Except for one situation around Christmas of 2000 when the children were together for a few hours to open Christmas presents, the two children were kept apart for over a year after the incident. Both boys underwent counseling from separate psychologists and were released to be in each other's company again in August of 2001. In September 2001, the Department of Children's Services received a written release from D.G.'s psychologist stating that he was ready to associate with Mr. Mangrum's son again. Subsequent to his written release, the children were allowed to play together with no further incident.

Mr. Gilmore was never informed of the incident by Mrs. Mangrum, D.G.'s psychologist, or DCS. However, he inadvertently found out in January of 2001 and attempted to obtain information regarding D.G.'s condition from DCS, D.G.'s psychologist, and the police department. Mr. Gilmore was unable to obtain much information, and Mrs. Mangrum has continually refused to discuss the situation with him. Mr. Gilmore does not approve of the two boys having any contact, even after approval of D.G.'s psychologist, and, in December 2002, filed a Petition for Change of Custody and for a restraining order to prevent the boys from having contact. The court granted the temporary restraining order until such time as a hearing could be had on the matter.

The matter was heard on August 5, 2002, after which the court determined that the Petition for Change of Custody should be denied, and the temporary restraining order was dissolved. Although the trial court determined that a material change of circumstance had occurred, it was also the court's opinion that it was not in the best interest of the child for custody to be changed from Mrs. Mangrum to Mr. Gilmore. Mr. Gilmore now appeals that decision asserting that it is in the best interest of D.G. for custody to be given to him.

The standard of review in this matter is *de novo* with a presumption that the determination of the trial court regarding the facts is correct unless the evidence presented preponderates against the factual determinations. *Brooks v. Brooks*, 992 S.W.2d 403 (Tenn. 1999); *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002); *Cranston v. Combs*, No. M2000-02101-SC-R11-CV, 2003 WL 21266696 (Tenn. June 23, 2003).

The Tennessee Supreme Court has recently clarified the proper standard to be applied to a petition to modify custody from one parent to another parent.

> We concluded that once a valid order of custody has been issued, subsequent custody modification proceedings should apply the "standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred,

---

[1] The testimony of both parties demonstrates a less than acrimonious, if not highly contentious, relationship between Mr. Gilmore and Mr. and Mrs. Mangrum. Mr. Gilmore's temper, immaturity, and lack of judgment have caused the trial court to issue a restraining order against him on two separate occasions.

which makes a change in custody in the child's best interests." *Blair v. Badenhope*, 77 S.W.3d 137, 148 (Tenn.2002). As explained in *Blair*, the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. *Id.* at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." *Id.* (citations omitted). We note that a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well being.

*Kendrick v. Shoemake*, 90 S.W.3d at 570; *see also Cranston v. Combs*, 2003 WL 21266696.

There could be little argument as to whether a material change of circumstances exists. However, given this material change in circumstance, "it must then be determined whether the modification is in the child's best interests. This determination should be made according to the factors enumerated in Tennessee Code Annotated section 36-6-106."[2] *Kendrick*, 90 S.W.3d at 570.

---

[2] This section of the Code provides as follows:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of younger child upon request. The preferences of older children should normally be given grater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of

(continued...)

-3-

In reviewing the trial court's determination of the child's best interest, several things must be taken into consideration.

> Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law.

*Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn.Ct.App. 1996). "Trial courts are normally in the best position to judge the credibility of the witnesses since they have seen and heard the witnesses testify. Thus a trial court's determination of credibility is entitled to great weight in this court." *Id.* at 633, (citing *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn.Ct.App. 1995)); *see also Whitaker v. Whitaker*, 957 S.W.2d 834 (Tenn.Ct.App. 1997).

Although the situation giving rise to this Petition is an extremely serious one, the trial court determined that the incident was caused by no fault or neglect of Mrs. Mangrum. The trial court further found that Mrs. Mangrum acted appropriately in reporting the incident and obtaining help for her son and even found her initial decision not to inform Mr. Gilmore of the abuse to be understandable given his past history for display of temper. Amy Burk, from DCS, testified as follows:

> Q.    Based upon what you know, your investigation of what you have in your file, has Marshal Mangrum been fully cooperative in, one, ascertaining the facts and, two, insuring that this child that's in question here, [D.G.], be properly taken care of in terms of his psychological and sociological needs?
> A.    Yes, sir.
> Q.    Do you have an opinion, based upon your expertise and your investigation of the file, as to whether these two children, [D.G.] and [B.], as stepbrothers, should be permitted to interact, one with another, in visitation, and family holidays, and picnics, and whatever it may be where these [two] children interact?
> A.    Based on the fact that the safety plan was followed and everything that I asked them to do was completed, I don't have a problem with that.
> Q.    How old was [D.G.] at the time of this incident?
> A.    Six.

---

[2](...continued)
a parent and such person's interactions with the child; and
    (10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn.Code Ann. § 36-6-106(2001).

Q. And how old was [B.] at the time of this incident?

A. Nine, I believe.

Q. Do you have any knowledge that the Department of Children's Services ever made any recommendations that this matter be pursued in the criminal justice system?

A. No. The idea - - it wasn't pursued, as far as charges, on the grounds that everybody cooperated, psych evals were done, or they had seen therapists, followed through with that, as opposed to taking it into juvenile court or anybody being charged.

The only other evidence presented in this matter regarding what would be in D.G.'s best interest was the testimony of Mr. Gilmore and Mrs. Mangrum. Mr. Gilmore's testimony regarding why the change of custody would be in D.G.'s best interest consisted of the following:

Q. Do you believe that it's in [D.G.]'s best interest to come and live with you?

A. Yes.

Q. And why is that?

A. Because he knows he's loved there. He knows he's safe. He'll be protected.

Q. Mr. Gilmore, this is your time to tell the Judge why you think [D.G.] should come to live with you. If there's anything else you want to add to that, you need to tell him.

A. Just that he knows I won't let anything happen to him.

. . . .

Q. What are the factors that make it in the best interest of [D.G.] to be changed from Marsha Mangrum's custody to your custody?

A. He'll be in a more safe and loving environment. He won't have to worry about sexual predators. He'll be with somebody that loves him all the time.

Q. Is that all?

A. I think he'd be a lot better off.

Q. Anything else?

A. I can't think of anything else at this time.

Q. Do you recall when I asked you that same question in your deposition?

A. No. I don't.

Q. Have you read your deposition since it was given?

A. I haven't seen it.

Q. On page 22 when I asked you that same question, beginning with line 9, I said, "What factors do you think makes it in the best interest of [D.G.] to be in your custody, as opposed to Marsha Mangrum's custody?" Were these the reasons you gave: "stable loving environment?"

A. Yes.

Q. "He knows that I love him, that I'll protect him and take care of him."

A. Yes.

Q. "I feel that he would be better off to be with me."

A. Yes.

Q. I asked you if there was anything else. What as your response?

A. "I guess not."

Testimony of the parties also revealed that Mr. Gilmore has displayed in the past, and continues to display, immature and unproductive behavior in dealing with custody of and visitation with his son, including refusing to give Mrs. Mangrum D.G.'s football uniform and forcing them to meet him prior to the child's football practice and change clothes in his truck. Evidence of Mr. Gilmore' violent behavior and inability to control his anger include the assault and battery of Mr. Mangrum a few years prior to the hearing in this matter, testimony that he continues to call Mr. Mangrum's son a "fagot" in the presence of D.G., and a most recent Order of Protection against him extending through November of 2002.

D.G. has resided with his mother for approximately eight years. The court found that Ms. Mangrum was not negligent or in any way at fault for the abuse and that she acted appropriately thereafter. D.G. has had no other problems reported in the Mangrum household, and appears to be, otherwise, safe and well cared for.

In reviewing the small amount of evidence presented as to what would be in D.G.'s best interest, we find this decision to be primarily based on the judge's determination of the credibility and character of the parents. As such, the evidence does not preponderate against the trial court's determination that it would not be in D.G.'s best interest to change primary residential custody to Mr. Gilmore. The decision of the trial court is, thus, affirmed.

_____

WILLIAM B. CAIN, JUDGE