IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 13, 2011

**ELIZABETH A. (HAYES) (FALIN) FINCH v. TIMOTHY A. HAYES**

**Appeal from the Circuit Court for Greene County**
**No. 03-CV-419     Kindall T. Lawson, Judge**

---

**No. E2010-00750-COA-R3-CV-FILED-OCTOBER 20, 2011**

---

In this post-divorce change of custody case, Elizabeth A. (Hayes) (Falin) Finch ("Mother") and Timothy A. Hayes ("Father") sought to modify their parenting plan regarding their daughter ("the Child"), who was born on July 13, 2000.  At the time of the divorce, the parties designated Mother as the primary residential parent and provided Father with regularly scheduled visitation.  Following a hearing in response to the parties' motions for modification, the court designated Father as the primary residential parent and awarded Mother co-parenting time.  Mother appeals.  We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

James F. Taylor, Rogersville, Tennessee, for the appellant, Elizabeth A. (Hayes) (Falin) Finch.

Roger A. Woolsey, Greeneville, Tennessee, for the appellee, Timothy A. Hayes.

**OPINION**

**I. BACKGROUND**

Mother and Father were divorced on April 24, 2003, and a parenting plan was entered pursuant to their agreement.  Six months later, Mother filed a motion for contempt and a petition to modify the parenting plan and child support.  Father denied Mother's allegations

and filed a counter-complaint in which he sought a change of custody. These motions were dismissed seven months later when neither party appeared at the scheduled hearing.

Approximately two years later, Father filed a petition to modify the parenting plan and a motion for contempt, requesting designation as the primary residential parent. Father argued that Mother had relocated to Virginia, had allowed unrelated men to reside with her and the Child, had failed to honor his visitation rights, and had attempted to hinder his relationship with the Child. Mother filed a motion to dismiss for lack of jurisdiction and a response to Father's allegations. Following a hearing on December 19, 2007, the trial court overruled the motion to dismiss and found that the petition to modify was well-taken, stating that Father was entitled to shared time with the Child pursuant to a modified parenting plan. The court further ordered that "neither party shall have overnight guests of the opposite sex in their home when the [C]hild is present" and that "neither party shall use or possess alcohol or drugs in the presence of the [C]hild or allow others to use or possess alcohol or drugs in the presence of the [C]hild." The court admonished Mother, stating that if she continued to live with unrelated men, it would "seriously consider a request for change of the residential custodian."

Approximately seven months later, Mother filed a motion for contempt and petition for modification of the parenting plan. Mother claimed that Father failed to pay child support, failed to spend quality time with the Child, failed to seek medical attention for the Child, allowed the Child to sleep with another child of the opposite sex, allowed members of the opposite sex to stay overnight in the Child's presence, had been verbally and physically abusive to the Child, was charged with public intoxication and possession of unlawful drug paraphernalia, and pled guilty to possession of drug paraphernalia. Father responded that he could not pay child support because of a material change in circumstance concerning his income, that he spent quality time with the Child, and that he had been placed on judicial diversion for possession of drug paraphernalia. Father filed a counter-petition and motion for contempt, alleging that Mother continued to allow unrelated men to reside in the home with the Child. Mother responded that she had been remarried, that Father failed to exercise his visitation rights, that he was unemployed and unable to support the Child, that he allowed a prostitute to sleep in the same bed with the Child, that he had been convicted of drug offenses, that he was charged with drug offenses committed while the Child was with him, and that he did not have reliable transportation. The court sent the parties to mediation; however, mediation proved unsuccessful.

At the hearing, Jimmy Hayes ("Grandfather") testified that Father had a drug addiction but admitted that while he thought Father exhibited withdrawal symptoms, he had never seen Father take drugs. He said that Father was visiting the Child on a regular basis until Father was charged with drug offenses. Grandfather stated that on occasion, Father left

the Child at his house and that other times, Grandfather and his wife stayed with the Child at Father's house. He claimed that Father's girlfriend stayed overnight while the Child was present. He asserted that Father had been violent toward him and cussed at him in front of the Child. He recalled that Father borrowed money from him to pay his bills and that sometimes Father did not have money to buy food. He admitted that he was charged with assault for an altercation involving Father, that he was aware that Mother probably allowed men to stay overnight in the residence while the Child was present, and that Mother refused to let Father see the Child.

Mary Ruth Hayes ("Step-Grandmother") testified that on occasion, she observed Father's girlfriend's car at Father's house at night and the following morning. She claimed that Father allowed a prostitute to spend the night. She recalled that she spent the night at Father's house on two or three occasions because the Child was upset. On one such occasion, she observed a "real red" mark on the Child's back and overheard Father warn the Child that she would "get the belt" if she called her grandparents again. She claimed that one night, she observed mouse feces on the Child's bed. She said after Father left the Child at her home, she took the Child to the hospital and discovered that the Child had strep throat. She remembered an occasion when Father came to the Child's school for an event and was "[v]ery shaky," had glassy eyes, and was exhibiting unusual behavior. She stated that Father had been arrested for possession of drug paraphernalia. She alleged that Father cursed in front of the Child, left the Child at her house one weekend during his visitation, and was unable to provide food and clothing for the Child.

On cross-examination, Step-Grandmother admitted that Father's alleged overnight visits with the prostitute occurred at least three years ago. She also admitted that she believed that the Child would be better off staying with her than with Father or Mother. She said that she had never seen Father use or possess drugs but that she observed times when Father was "shaking" and would "get real hyper." She said that while she did not see Father hit the Child, she saw a mark on the Child and heard Father screaming at the Child.

Laura Arnsfield, a behavior health specialist with Holston Medical Group, testified that she believed that the Child should live with Mother. She recalled that the Child had "consistently maintained" her desire to live with Mother and that when the sessions began, the Child was unfamiliar with Father and did not want to visit him. Since that time, the Child said that the visits with Father have been better. She claimed that during Father's visitation, the Child felt more comfortable if others were present and that the Child often stayed with the grandparents or Judy Brown's sister instead of with Father. She said that one night when the Child had stayed in a tent outside the house with other children, the Child was too scared to go back into the house. She acknowledged that Mother told the Child that Father had been arrested. She said that the Child was resentful toward Father because he hurt Grandfather

and because Father did not want Grandfather to see her. She recalled that the Child was eventually allowed to visit Grandfather, despite Father's protestations.

Father admitted that he pled guilty to possession of drug paraphernalia in January 2008, that he was arrested in June 2008 for public intoxication and possession of drug paraphernalia, and that he pled guilty in January 2009 to public intoxication. He recalled that when he was arrested in June 2008, the Child was staying with the grandparents. He claimed that the June 2008 drug paraphernalia charge was dismissed and that although he pled guilty to public intoxication, he was not under the influence of anything that night. He testified that he had never had illegal drugs in his house or allowed anyone in his house who was under the influence of illegal drugs. He denied that he dated a prostitute but admitted that for two months, he dated a woman whose name was similar to a well-known prostitute. He said that he had only dated one woman, Judy Brown, since January 2007.

Regarding his visitation with the Child, he said that Mother was compliant until June 2008, when she told him that he "was never going to see [the Child] again." Since that time, Mother would not let him see the Child and interrupted his telephone calls. He admitted that he was out of work for a couple of months but said that he always had food in the house and that the house was always clean. He recalled that when Step-Grandmother found what appeared to be mouse feces on the Child's bed, he changed the sheets. He testified that he never hit the Child and that the Child never complained about a red mark on her back. He said that he allowed the Child, who was eight, to sleep in a tent outside but explained that the Child was in the tent with Judy Brown's niece, who was ten. He claimed that the tent was next to the back door, that the door was unlocked, and that he checked on the children periodically. He opined that it was "almost impossible" to maintain his relationship with the Child because Mother called the Child during his visitation, causing the Child to become upset.

Regarding his desire to become the primary residential parent, he asserted that even though Mother had interfered with his visitation, he would not interfere with Mother's visitation and would follow the court's order regarding her rights. He said that he had a full-time job with flexible hours, allowing him to care for the Child. When asked how he would supervise the Child while maintaining his full-time employment, he explained that he could work while the Child was in school and pick her up after school. He admitted that he allowed Judy Brown to spend the night on two occasions in the last month while the Child was present but said that he would not allow her to stay overnight again until they were married.

Mother testified that since the court's last order, only her current husband, Randy Finch, lived with her and the Child. When the court directed her to refrain from overnight visitation with members of the opposite sex, she told her boyfriend, Charles Falin, to move

-4-

out.[1]  Charles Falin stayed with one of her friends until she bought a camper for him to live in on the property, which was approximately 89 acres.  The camper had its own address, a driveway, plumbing, and electricity.  Charles Falin stayed in the camper for approximately eight weeks and then left.  Shortly thereafter, Mother began dating Randy Finch, who moved into another camper that was three to four miles from her residence.  However, he only stayed overnight with her at the residence when the Child was not present.

Relative to Father's visitation with the Child, Mother stated that in June 2008, Father sent relatives to retrieve and return the Child.  She asserted that Father was arrested during his visitation with the Child and that the Child was often upset when she left for visitation and when she returned from visitation.  She admitted that in June 2008, she refused to let Father exercise his visitation rights because of his behavior.  She believed that it was in the Child's best interest to maintain a healthy relationship with Father but asserted that Father did not have the Child's best interest at heart.  Regarding her ability to care for the Child, Mother testified that she lived in a four-bedroom house with her husband, his son, and her three daughters, including the Child.  She and her husband maintained suitable employment, and she did not have a criminal record.

Charles Falin testified that he moved in with Mother two weeks after they started dating in October 2007.  He recalled that in December 2007, Mother told him that he needed to move out of the residence because the court had prohibited her from having overnight guests of the opposite sex.  He said that he stayed in the house for a short time after the court's order but that he eventually moved into a camper that she purchased and placed "six or eight feet" from the house.  He claimed that he slept in the camper "most of the time" when the Child was present but that on occasion, he stayed overnight in the residence when the Child was present.[2]  He remembered that after he and Mother separated, he observed Randy Finch, who appeared to have just taken a shower, in the house at 10 p.m.

Melissa Jetter, Charles Falin's fiancé, said that Charles Falin left her in October 2007 and returned in March 2008.  She did not know whether he lived in a camper while he was dating Mother but stated that he never said anything about living in a camper.[3]  She admitted that she was upset with Charles Falin and Mother about the situation.

---

[1]During a break in the testimony, Mother talked to Charles Falin about the trial and his potential testimony. The court admonished Mother for her behavior.

[2]He confirmed that Mother had talked to him about this portion of his testimony while he was waiting outside the courtroom.

[3]She confirmed that she heard Mother talking to Charles Falin about his potential testimony while they were waiting outside the courtroom.

Jeanette Hayes, Father's ex-wife, testified that Father had a good relationship with their three grown daughters, that she never saw Father mistreat them, and that she would not have any reservations about his ability to care for a child. She admitted that she heard rumors about Father's drug abuse but said that she never saw "anything like that out of him."

Becky Watts testified that Father had been dating her sister, Judy Brown, for approximately two and half years. She did not believe that Father had ever used or possessed drugs. She claimed that Father always had food at his house and kept the house generally clean. She opined that Father had a "really good relationship" with his other three daughters and wanted to have a "really good relationship" with the Child. She asserted that Father was "really good" to the Child and that she would not have any hesitation about him becoming the primary residential parent for the Child. She recalled that the Child had stayed with her and her daughter approximately three times and that she also sent her daughter to stay with the Child and Father on other nights. She said that the Child never seemed distressed or fearful when she was with Father.

Judy Brown testified that she was dating Father. She claimed that her 11-year old son and her niece were friends with the Child and often spent time together when the Child was visiting Father. She recalled that Father had supervised her son, her niece, and the Child overnight but that the Child and her son never slept in the same bed. She asserted that when the children camped, an adult always supervised them. She admitted that she spent the night at Father's house when the Child was present on two occasions but asserted that she slept on the opposite end of the house from Father. She opined that the Child would run and play while with Father but that Mother's telephone calls during Father's visitation caused the Child to become "rattled." She said that Father always had food at the house and was able to care for the Child.

Following the hearing, the court found the testimony from Charles Falin and Father to be credible but found that Mother's credibility was "totally destroyed." The court held that there was a "substantial and material change in the circumstances." The court acknowledged that Father had "minor misdemeanor brushes with the law" but held that Father's behavior "did not directly affect the [C]hild or the [C]hild's welfare." The court found that Father had "no history of alcohol or drug abuse as it ha[d] been alleged" and that there was "no shred of evidence" that Father had been living with a prostitute. The court designated Father as the primary residential parent of the Child and found Mother in contempt for violating the court's order. Mother filed a motion to reconsider or for new trial, and the court denied the motion, holding "that a material change of circumstance[] had occurred and that the child's best interest[] would be served by changing the [p]ermanent [p]arenting [p]lan in existence at the time [Father] filed his [p]etition to [m]odify." This appeal followed.

## II. ISSUE

Mother's restated sole issue on appeal is whether the trial court properly designated Father as the Child's primary residential parent.

## III. STANDARD OF REVIEW

On appeal, we review the decision of a trial court sitting without a jury de novo upon the record, accompanied by a presumption of correctness of the trial court's findings of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

In applying the de novo standard, we acknowledge that "[t]rial courts are vested with wide discretion in matters of child custody" and that "appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). "Because '[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings themselves,' appellate courts are 'reluctant to second-guess a trial court's decisions.'" *Johnson v. Johnson*, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004) (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)). Appellate courts should only set aside the trial court's judgment in such cases when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

## IV. DISCUSSION

Mother contends that the trial court failed to make a specific finding that designating Father as the primary residential parent was in the Child's best interest. Mother further asserts that while Father had been arrested for public intoxication and possession of drug paraphernalia while caring for the Child, there was no proof presented that her sexual conduct harmed the Child. Father responds that Mother failed to adhere to the parenting plan by prohibiting the Child's visitation with Father and by allowing members of the opposite sex to reside in the home with the Child, thereby evidencing a material change in circumstance that allowed the court to modify the existing arrangement. Father asserts that

given Mother's refusal to allow the Child to visit him and her dishonest behavior, the change in custody was in the best interest of the Child.

When a petition to change or modify custody is filed, the parent seeking the change has the burden of showing (1) that a material change in circumstance has occurred and (2) that a change in custody is in the child's best interest. *Kendrick v. Shoemake*, 90 S.W.3d 566, 575 (Tenn. 2002); *Blair v. Badenhope*, 77 S.W.3d 137, 148 (Tenn. 2002); *In re M.J.H.*, 196 S.W.3d 731, 744 (Tenn. Ct. App. 2005); *In re Bridges*, 63 S.W.3d 346, 348 (Tenn. Ct. App. 2001). A finding that a material change in circumstance has occurred is a threshold inquiry. *Kendrick*, 90 S.W.3d at 570; *Blair*, 77 S.W.3d at 150; *see also Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003) (applying the standard affirmed in *Kendrick*); *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006). "If a material change in circumstance[] has occurred, it must then be determined whether the modification is in the child's best interest[]." *Kendrick*, 90 S.W.3d at 570.

There are no bright line rules as to whether a material change in circumstance has occurred, but the Tennessee Supreme Court has directed courts to consider (1) whether the change occurred after the entry of the order sought to be modified; (2) whether the change was known or reasonably anticipated when the order was entered; and (3) whether the change is one that affects the child's well-being in a meaningful way. *Cranston*, 106 S.W.3d at 644 (citing *Kendrick*, 90 S.W.3d at 570). Indeed, Tennessee Code Annotated section 36-6-101(a)(2)(B) specifically provides,

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change of circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstances may include, but is not limited to, failure to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Here, both Mother and Father failed to comply with the parenting plan. Father allowed a member of the opposite sex to spend the night at his residence while the Child was present on at least two occasions, while Mother consistently had a member of the opposite sex residing with her and the Child in the residence. Mother denied this fact; however, the court found that Mother's credibility was "totally destroyed." Moreover, Mother prevented Father from exercising his visitation rights. These changes occurred after the entry of the order sought to be modified and were in direct violation of that order. These changes damaged the Child's relationship with Father and impacted the stability of the Child's home

environment, thereby affecting the Child's well-being in a meaningful way. Accordingly, we conclude that the trial court did not err in determining that a material change of circumstance occurred, thereby necessitating the further determination of whether modification or a change of custody was in the Child's best interest.

Having concluded that a material change of circumstance occurred, we must now determine whether the trial court erred in finding that the designation of Father as primary residential parent was in the Child's best interest. While the court did not issue specific findings of fact on this issue other than generally stating it was "deciding the future or what's best on behalf of the [C]hild based on the proof," the record and the court's findings support the trial court's ultimate decision. *See generally Cranston*, 106 S.W.3d at 645 (providing that the record on appeal and the court's findings were sufficient to facilitate appellate review even though the court applied the wrong standard when changing the original custody order). Additionally, the court denied the motion for new trial, stating "that a material change of circumstance[] had occurred and that the child's best interest[] would be served by changing the [p]ermanent [p]arenting [p]lan in existence at the time [Father] filed his [p]etition to [m]odify." However, "[w]hen the trial court makes no specific findings of fact . . . we must review the record to determine where the preponderance of the evidence lies." *Kendrick*, 90 S.W.3d at 570 (citing *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn 1997)).

Relative to the child's best interest, Tennessee Code Annotated section 36-6-106(a) provides, in pertinent part,

(a) In . . . any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made in the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out below, the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . . ;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child if twelve (12) years of age or older;

> (B) The court may hear the preference of a younger child on request. The preference of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent, or to any other person . . . ;

(9) The character and behavior of any other person who resides in or frequents the home of the parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance or parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

In setting the residential schedule, the trial court is also instructed to consider similar, relevant factors. *See* Tenn. Code Ann. § 36-6-404(b) (listing additional factors).

In this case, the *credible* testimony presented at trial reflected that the Child enjoyed a relationship with both parties and that both parties were capable of providing the Child with food, clothing, medical care, education, and other necessary care. No evidence was presented regarding the mental and physical health of the parties; the home, school, and

community record of the Child; physical or emotional abuse of the Child;[4] or behavior of those who reside in or frequent the home of the parties.

Testimony was presented that Mother allowed unrelated adult men to live with her and the Child in direct violation of the court's order. In an attempt to evade that order, Mother placed a camper within feet from the house. We acknowledge that Mother is now married; however, her actions are still relevant to this case. Father also ignored the court's order on two occasions; however, he, unlike Mother, was truthful about his indiscretions. While there was no proof that these indiscretions harmed the Child, Mother's use of the camper to evade the court's order, her repeated refusal to admit her indiscretions, and her attempt to influence Charles Falin's testimony at trial portray dishonest behavior and an inability to comply with future court orders. Moreover, Mother ignored the purpose and substance of the court's order regarding overnight visitation, namely to provide a stable, satisfactory environment for the Child and place her Child's needs above her desires. Thus, while removing the Child from Mother would interrupt the continuity of the Child's care and Mother's status as the primary caregiver, the evidence presented at trial reflects that the Child has not lived in a stable, satisfactory environment with a stable family unit for a significant period of time.

Mother also refused Father's visitation rights in direct violation of the court's order, thereby evidencing her refusal to encourage the Child's relationship with Father. As reflected by the testimony presented at trial, the Child's relationship with Father was hindered by Mother's behavior and her repeated refusal to facilitate visitation. While the Child told Laura Arnsfield that she wanted to live with Mother, the Child was "unfamiliar" with Father because of Mother's interference with his visitation rights. Witnesses testified that Father generally enjoyed a good relationship with the Child and that Father was capable of providing for the Child. We acknowledge Father's past criminal behavior, but we, like the trial court, cannot conclude that these instances affected the Child or impacted his ability to adequately care for the Child in the future.

With all of the above considerations in mind, we conclude that the preponderance of the evidence supports the trial court's naming of Father as the primary residential parent as being in the best interest of the Child. Accordingly, we affirm the decision of the trial court but further advise the parties that failure to promote and encourage a close relationship between the Child and the other parent may result in the custody determination being reviewed in the future.

---

[4] Grandmother found a red mark on the Child after the Child told her that Father hit her, but no testimony was presented regarding the severity of the mark or the circumstances under which the Child received the mark.

-11-

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Elizabeth A. (Hayes) (Falin) Finch. If the current custody arrangement conflicts with the trial court's ruling affirmed by this opinion, then that arrangement will remain in place until the conclusion of the appellate proceedings when the appellate court clerk issues the mandate pursuant to Rule 42 of the Rules of Appellate Procedure.

_____
JOHN W. McCLARTY, JUDGE