# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
February 14, 2007 Session

## IN RE E.J.M. (d.o.b. 10/31/94)

## LEE T. MYERS v. SANDRA BROWN

An Appeal from the Juvenile Court for Shelby County
No. G2405; R8527    George E. Blancett, Sp. Judge

_____

No. W2005-02520-COA-R3-JV - Filed July 19, 2007

_____

This case involves the third and fourth appeals (consolidated) of successive petitions to modify custody. The mother and father of the child at issue were never married. The mother was designated the primary residential parent for the child, and the father was given designated parenting time and ordered to pay child support. In 2002, the father filed a petition to modify custody. The trial court denied the father's petition, and the decision was affirmed by this Court ("*E.J.M. I*"). During the pendency of that appeal, the father filed a second petition for a change of custody based on facts that arose after his first petition was denied. A hearing on this petition was conducted shortly after this Court issued its decision in *E.J.M. I*. A juvenile court judge held that, though he might otherwise change custody to the father, he was bound by the appellate decision in *E.J.M. I* to give final decision-making authority to the mother. Nevertheless, joint custody was ordered. The father now appeals that decision. Shortly after that, the father filed another petition to modify custody, based on facts that arose after the decision to award joint custody. Another juvenile court judge conducted a hearing, heard testimony, and reviewed the entire record. After doing so, the juvenile court judge strongly criticized the father's litigiousness and, in light of the pending appeal of the joint custody award, dismissed the father's petition for lack of jurisdiction. The father appeals that decision as well. Both appeals were consolidated, but the appeal was dismissed due to a procedural defect (*E.J.M. II*). The procedural defect was cured, and we now hear the consolidated appeal. We reverse the conclusion by both juvenile court judges, holding that the trial court has jurisdiction and authority to modify custody even while an appeal is pending, so long as the modification is based on new facts and changed conditions that arose after the trial court judgment that is the subject of the appeal. The cause is remanded for a decision on the father's petitions to modify custody.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Reversed and Remanded for Further Proceedings

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., joined, and W. FRANK CRAWFORD, P.J., W.S., did not participate.

Mitchell D. Moskovitz and Adam N. Cohen, Memphis, Tennessee, for the appellant, Lee T. Myers.

Sandra Brown, *pro se* (no brief filed).

**OPINION**

Petitioner Lee T. Myers, D.D.S. ("Father"), and Respondent/Appellee Sandra Brown ("Mother") are the natural parents of the minor child, a daughter, E.J.M., born October 31, 1994. The parents were never married. In June 1995, pursuant to a voluntary acknowledgment of paternity, the Juvenile Court for Shelby County entered an order of legitimation. In 1996, after a flurry of litigation over visitation and child support matters, Mother was designated as the primary residential parent of the child, and Father was granted visitation and ordered to pay child support.

Since then, the child has been the subject of protracted and contentious litigation, primarily concerning custody, visitation, and decision-making for her welfare. This consolidated appeal is the third appeal in this case. The history between the parties is set forth in detail in the opinion in the first appeal, *In re E.J.M.*, No. W2003-02603-COA-R3-JV, 2005 WL 562754 (Tenn. Ct. App. Mar. 20, 2005) ("*E.J.M. I*").

The instant matter is a consolidation of two separate appeals, referred to herein as Appeal 1 and Appeal 2, both arising from Father's most recent petitions to obtain custody of the child. Appeals 1 and 2 were heard by different trial judges. Both concluded that proceedings in this Court restricted the trial court's ability to act on Father's petitions. However, after hearing testimony, each appeared to have different views of the parties.

By way of background, we will briefly explain the facts and the holding in *E.J.M. I*. We will then discuss the facts which gave rise to Appeal 1. After that, we will set out the facts underlying Appeal 2, which occurred while Appeal 1 was pending. The issues raised in both appeals will then be considered together.

*E.J.M. I*

Mother is a single mother, and E.J.M. is her only child. She works in a support position in a pharmacy, and she and E.J.M. live in Southaven, Mississippi. Father is a dentist with a successful practice in Memphis, Tennessee. Since approximately 2000, Father has been married to Iris Meyers, a teacher, and they have one child several years younger than E.J.M. Father and his wife live in Memphis, Tennessee. During extensive litigation regarding E.J.M., Father has been represented by counsel; Mother was initially represented by an attorney, but as the litigation wore on, has had to represent herself *pro se*. During much of the litigation, there has been a guardian ad litem appointed to represent the child.

In April 2002, in order to resolve the litigation and the frequent disputes regarding E.J.M.'s welfare, the parties reached an agreement regarding her custody and care. The agreement was

incorporated into a comprehensive consent order entered by the Juvenile Court on April 22, 2002. In the order, Mother remained the primary residential parent; Father had designated parenting time and had decision-making authority in certain areas. The parties were required to consult with one another on all major decisions regarding E.J.M.'s "health, education, extracurricular activities, and general welfare." The April 2002 order also provided that psychologist Peter Zinkus ("Dr. Zinkus"), who had worked with E.J.M. for some time, would be the final arbiter on any dispute regarding such issues.

In the summer of 2002, not long after the consent order was entered, another dispute arose. E.J.M. had completed the second grade at Hanley Elementary, a public school in Memphis, but was struggling academically. In violation of a Juvenile Court order, Mother removed the child from enrollment in the third grade at Hanley Elementary, and enrolled her in second grade at Sacred Heart, a private school. This gave rise to other disputes, and Father filed petitions for contempt, for injunctive relief, and for a change in custody requesting that he be designated as the primary residential parent.

In September 2002, prior to the final hearing on Father's petitions, Father was granted temporary custody of the child; this lasted for a period of about ten months. More petitions were filed by the parties. In June 2003, Juvenile Court Referee Cary Woods conducted a hearing on the parties' outstanding petitions. Referee Woods concluded that Father had not proven a material change in circumstances so as to warrant permanently designating him as primary residential parent. He recommended that Mother be restored as the primary residential parent, and that the parties be required to continue to participate in counseling with Dr. Zinkus. This order omitted the provision in the prior consent order requiring that Dr. Zinkus be the final arbiter of the parties' disputes. Referee Woods' findings and recommendations were approved by a juvenile court judge. Father filed a request for a hearing before a juvenile court judge on Referee Woods' decision and Father's request for an injunction to prevent Mother from removing E.J.M. from Hanley Elementary. *See E.J.M. I*, 2005 WL 562754, at *4-*7.

In September 2003, Juvenile Court Referee Herbert Lane was appointed Special Juvenile Court Judge. Judge Lane conducted a three-day hearing on Father's petitions for custody and for injunctive relief. Judge Lane found that, although Mother had interfered to some extent with Father's parenting time, the parties' primary dispute was over the child's education. Observing that the parties "simply can't talk to one another" and were "probably never going to be able to agree" on E.J.M.'s school issues, he concluded that the primary residential parent, Mother, would be permitted to make the final decisions on such issues. He said that Father would remain involved in the child's education and could bring any problems to the court's attention, and he cautioned Mother not to interfere with Father's residential time at the risk of losing custody of E.J.M. Therefore, Judge Lane affirmed Referee Woods' recommendation to restore Mother as E.J.M.'s primary residential parent.

On appeal, this Court affirmed the decision by Referee Woods and Judge Lane. *Id.* at *21. We noted that both parents had shown themselves to be fit and loving parents. We recognized that

the child was placed in Father's temporary custody as a result of Mother's disobedience of court orders relating to E.J.M.'s placement in school, noting that Mother should not be removed as the primary residential parent as punishment for her disobedience absent a determination that her actions adversely affected the well-being of the child. *Id.* at \*20-\*22. Giving due deference to the Juvenile Court's credibility determinations, this Court concluded that the evidence did not preponderate against the Juvenile Court's finding that no material change in circumstances existed sufficient to change custody to Father. *Id.* at \*22.

In ***E.J.M. I***, Father argued in the alternative that the Juvenile Court erred in divesting him of final decision-making authority with respect to E.J.M.'s welfare. We agreed with the Juvenile Court that the overwhelming evidence established the parties' inability to compromise and work together for the benefit of the child, with or without the help of Dr. Zinkus. Therefore, we held that, in a situation where the parties are unable to compromise, one parent must be given the authority to make final decisions:

> Divesting one party or the other of final decision-making authority becomes the only option, and it is in the best interest of E.J.M. at this juncture that the decision-maker be the primary residential parent, Mother. The parties are still required to consult with Dr. Zinkus to resolve their communication problems. If Mother refuses to comply with the order to consult with Dr. Zinkus, the Juvenile Court can address the issue at that time in its discretion.

*Id.* at \*23. Accordingly, we affirmed the decision to deny Father's petition for a change of custody and to designate Mother as the parent with final decision-making authority for E.J.M.

## Appeal 1[1]

In May 2004, while the appeal in ***E.J.M. I*** was pending, Mother began taking E.J.M. to a new psychologist, Dr. Shirley Wilson ("Dr. Wilson"). Neither Father nor Dr. Zinkus were told that E.J.M. was seeing Dr. Wilson. In December 2004, Mother took the child to a new physician, Remilekun S. Adesoji, M.D. ("Dr. Adesoji"), again without informing either Father or Dr. Zinkus. Dr. Adesoji prescribed Ritalin to E.J.M. for attention deficit disorder ("ADD"). As background, Dr. Zinkus had previously evaluated E.J.M. and was of the opinion that she did not need such medication. In order to prevent Father from learning that E.J.M. was taking ADD medication, Mother gave E.J.M.'s school a supply of the Ritalin to administer to her on Father's parenting days. Despite Mother's efforts, in January 2005, Father learned from the school that E.J.M. was taking Ritalin. After discovering this, Father requested the child's medical records from Dr. Adesoji. Dr. Adesoji, however, refused to release the records to Father, because in the intake information given to Dr. Adesoji, Mother had not listed anyone as E.J.M.'s father. The guardian ad litem ("GAL") for E.J.M., appointed years earlier in prior proceedings, requested that Mother sign a release so that she could obtain the child's medical records, but Mother refused.

---

[1]No. W2005-02520-COA-R3-CV.

-4-

Based on Mother's conduct, on February 1, 2005, Father filed a petition to modify custody and to find Mother in contempt of court. Because Mother had refused to sign the release, the GAL also filed a petition for contempt against Mother. On February 9, 2005, Father filed an emergency motion asking the Juvenile Court to enjoin Mother from continuing to administer Ritalin to E.J.M. The motion was granted, and Mother was enjoined from administering the medication to E.J.M. pending a report from Dr. Zinkus. The order further required Mother to list Father as E.J.M.'s father in Dr. Adesoji's records.

After Father was listed as a parent on E.J.M.'s medical records, he obtained a copy of them. When he did so, he discovered that, unbeknownst to him, Mother had been taking E.J.M. for treatment with the psychologist, Dr. Wilson, since May 2004. Father then procured Dr. Wilson's records, which indicated that Mother had told Dr. Wilson that Dr. Zinkus had previously diagnosed E.J.M. with ADHD, which he had not. Dr. Wilson's records also indicated that Mother told Dr. Wilson that E.J.M. was a below-average, C/D student, which Father felt was inaccurate.[2]

On March 24, 2005, two weeks after the Court of Appeals issued its decision in **E.J.M. I**, Referee Woods conducted a hearing on Father's petitions. Mother, Father, and the GAL appeared at the hearing. Father was represented by counsel; Mother appeared *pro se*.

At the outset of the hearing, the GAL strongly criticized Mother for having E.J.M. seen by a psychologist other than Dr. Zinkus and for having E.J.M. placed on Ritalin without disclosing these facts to Father or Dr. Zinkus. The GAL acknowledged, however, that since Mother's actions came to light, Dr. Zinkus had reconsidered his opinion, and he thought perhaps that E.J.M. would benefit from taking Ritalin and wanted her to take it for a trial period.

At the hearing, Mother did not testify under oath, but Referee Woods asked for her position. She admitted that she did not consult with either Father or Dr. Zinkus before taking E.J.M. to the second psychologist, Dr. Wilson, or to the second physician, Dr. Adesoji, or before permitting the child to take Ritalin. Mother said that she felt from the prior court proceedings that she had the authority to seek second opinions and make decisions in E.J.M's best interest as the primary residential parent. She explained that the offices of Dr. Wilson and Dr. Adesoji were in Mississippi, near where she lived and where the child went to school, and were more convenient than Dr. Zinkus' office in downtown Memphis, Tennessee.

Father testified at the hearing. He noted that, under the April 2002 consent order, the parties were required to consult with one another on major issues and, in the event of a dispute, Dr. Zinkus had final decision-making authority. He acknowledged, however, that the appellate court had determined in **E.J.M. I** that Mother, as the primary residential parent, should have final decision-making authority. Father said that, in the spring of 2004, he and Mother consulted with Dr. Zinkus regarding the possibility that E.J.M. had ADD or ADHD. After testing, Dr. Zinkus was of the opinion that E.J.M.'s difficulties in school were not because of ADD or ADHD, but he

---

[2]Father asserted that E.J.M. had not made any Ds and was an average student.

recommended that E.J.M. be held back a grade because she had started school too early. Later, Father said, he was surprised to learn from a school employee that E.J.M. was taking Ritalin, because Mother not consulted with him about E.J.M. being on such medication. Father noted that he had parenting time with E.J.M. for several days in December, and he was not told at that time that she had been taking Ritalin. Father indicated that he was not strictly opposed to the child taking Ritalin, but he thought that he should have been consulted first and made aware when the child was placed on the medication. He stated, "I'm not suffering, [Mother's] not suffering. It's [E.J.M.] suffering because she feels – doesn't even feel free enough to even express to someone she's on medication." Father requested that he be designated as primary parent, or that at least Mother be required to consult him about the child's medications and other important issues.

At the conclusion of the hearing, Referee Woods found that Mother intended to deceive Father about the fact that E.J.M. had been prescribed medication, and that her conduct was "a blatant violation of the [April 2002] consent order," specifically the provision requiring the parties to consult with one another on such issues and, in the event of a dispute, submit the issue to Dr. Zinkus to resolve. Based on this, Referee Woods stated that he had decided to "grant the petition to modify primary residential status of [E.J.M.] and award custody to the father."

At that point, Mother, *pro se*, mentioned to Referee Woods the Court of Appeals decision issued two weeks prior, granting her decision-making authority. Father's counsel acknowledged the appellate court opinion but contended that Mother was never permitted to make such decisions without consulting Father. He noted that Mother had not only failed to consult but had in fact tried to conceal her decision from Father. Referee Woods stated that he believed that Mother was "endangering the well-being of [E.J.M.] by initiating, I consider, a major health issue without consulting Dr. Zinkus and/or the father in the prescription of . . . a significant medication that affects her well-being and mental status while at school and at home." Referee Woods then took a recess to review the Court of Appeals opinion in its entirety.

After reviewing the appellate court decision, Referee Woods concluded that he was bound by it to vest final decision-making authority in Mother:

> I believe I am bound by the appeals court decision. And in reviewing the matter, it says, divesting one party or the other of the final decision-making authority becomes the only option. And it is in the best interest of EJM at this juncture that the decision-maker be the primary residential parent, and it says the mother.

Based on the appellate court decision, then, Referee Woods stated that he would deny Father's petition to modify custody to designate him as the primary residential parent. However, after further argument and inquiries by Father's attorney and the GAL, Referee Woods changed his mind and granted Father's petition in part, awarding the parties joint custody, with Mother being the primary custodian. Mother was ordered to consult with Father on "any major decisions concerning said child, such as educational, medical, or health decisions." In addition, Mother was held in contempt of court and was ordered to pay $1,000 of Father's attorney's fees. On the same day, Referee Woods

issued findings and recommendations consistent with his oral ruling. Those findings and recommendations were confirmed by the Juvenile Court Judge. Father now appeals the trial court's March 24, 2005 order. This appeal is referred to in this Opinion as Appeal 1.[3]

## Appeal 2[4]

The second appeal, Appeal 2, arises out of events that occurred after the hearing and order that is the subject of Appeal 1. Mother advised Father that she wanted to take E.J.M. to Sandersville, Georgia, for spring break. Father acquiesced to Mother's plans. As it turned out, over spring break, Mother actually took the child to North Carolina, rather than Georgia. Several months later, Mother took E.J.M. to New York; Father was aware of this trip. Unbeknownst to Father, however, Mother and E.J.M. were accompanied by Mother's boyfriend and Mother's aunt on the trip. Bringing the boyfriend on the trip was contrary to Referee Woods' admonition that Mother not expose the child to any unrelated overnight visitors of the opposite sex. While in New York, Mother took E.J.M. across the border to Canada to Niagra Falls on a day trip, without Father's knowledge. Through conversations with E.J.M., Father found out about these events.

E.J.M.'s school year began on August 4, 2005. Under the Juvenile Court order, once school began, Father was permitted to have overnight parenting time with E.J.M. every Wednesday that he did not have weekend visitation. On Father's first Wednesday, August 10, 2005, E.J.M. went to Mother's home with her regular carpool driver. Father's wife went to E.J.M.'s school to pick up E.J.M. and she was not there. When Father contacted Mother to advise her that it was his parenting day, Mother insisted that it was not, and Father ended up missing his parenting day.

Based on these events, on August 12, 2005, while Appeal 1 was pending, Father filed another petition to modify custody and for contempt. On November 9, 2005, while that petition was pending, another instance occurred in which Father did not have parenting time on a Wednesday when he was supposed to have the child after school. On another occasion, Mother called Father to consult with him about E.J.M.'s school performance. Mother told Father that E.J.M. was failing three of her six subjects, and that she had received multiple failing grades on assignments in the subjects she was passing. Father's response was to suggest that E.J.M. live with him temporarily. This prompted an angry exchange that included Mother cursing at Father. Father then heard E.J.M. in the background defending him to Mother, and it was clear that E.J.M. had overheard Mother's angry remarks to Father.

---

[3] Initially, Father appealed the juvenile court's decision to the Shelby County Circuit Court. The circuit court dismissed the appeal for lack of jurisdiction. Father appealed to this Court. This Court determined that the circuit court was correct in finding that it lacked jurisdiction over the appeal, but that it erred in dismissing the case; rather than dismissing the case, the circuit court should have transferred it to this Court. Therefore, this Court reversed and remanded the case to the circuit court with instructions for the circuit court to enter an order transferring the case to the Court of Appeals. *In re E.J.M.*, No. W2005-02520-COA-R3-CV, 2006 WL 2052713 (Tenn. Ct. App. July 25, 2006) ("*E.J.M. II*"). After remand, the case was transferred back to this Court.

[4] No. W2006-00365-COA-R3-JV.

Father's August 12 petition was set for an initial hearing in the Juvenile Court on November 17, 2005. On that date, however, counsel for Father was informed that Mother was not properly served with notice of the hearing and that, consequently, the matter was stricken from the Court's docket. Despite this, Father, his counsel, and the GAL, in Mother's absence, approached Juvenile Court Referee Dan Michael and made an *ex parte* request for an immediate change of custody, alleging that E.J.M. was dependent and neglected because Mother had neglected her education. Referee Michael told them that if they returned to court the following day with a petition for dependency and neglect and for a protective order, he would execute a protective custody order in favor of Father. This was done, and Referee Michael granted temporary custody of E.J.M. to Father. Referee Michael's temporary custody order was affirmed at a preliminary hearing before Juvenile Court Referee Cary Woods. Referee Woods ordered temporary custody to remain with Father pending further orders of the court. The Juvenile Court reset Father's August 12 petition for custody and his November 18 petition for a protective order for a hearing on December 1, 2005.

The hearing commenced on December 1, 2005, as scheduled, before Juvenile Court Referee Michael. Present were Father's attorney, Father and his wife, the GAL, and Mother. Mother again appeared *pro se*. At the outset, Mother asked for a continuance to obtain funds to hire counsel. That request was denied, and the hearing proceeded.

At the outset of the hearing, Father's attorney gave Referee Michael a lengthy outline of the history of the litigation from Father's perspective, covering the April 2002 consent order, the requirement that disputes be submitted to Dr. Zinkus, the order of temporary custody to Father, the restoration of Mother as primary residential parent, the appeal of that order, Mother's actions in taking E.J.M. to a second psychologist and physician and obtaining a prescription for ADD medication and concealing it from Father, the decision of the appellate court in *E.J.M. I*, the hearing by Referee Woods on the issues surrounding the ADD medication, Referee Woods' reading of the appellate court opinion in *E.J.M. I* and his order of joint custody, the appeal of that order in Appeal 1, and finally a detailed recitation of the events since Appeal 1 regarding Mother's trips with E.J.M., disputes over Father's parenting time and the angry telephone exchange. The GAL then told Referee Michael that she agreed with Father's attorney and again advocated in favor of Father's position.

Referee Michael then asked Mother for her position, which she stated briefly. She first alluded to the thickness of E.J.M.'s Juvenile Court file from the many court proceedings. She said that the problems arose between Father and her, and that she had been able to co-parent with Father's wife, without the involvement of Father's attorney, the GAL, or a judge. She added, "You want to know why I don't have any witnesses? They're tired, Your Honor. They're tired. Teachers can't teach, my friends can't work, they can't be parents because every time we look up we're in court."

Father testified first. He noted that Mother had initially told him that she and E.J.M. would take a spring break trip to Georgia but they ended up going to North Carolina. Father emphasized that he did not object to the destination but objected to the fact that he was not told of the change in itinerary. Regarding the trip to New York, Father objected to the fact that he was not told they would take a day trip to Canada and that Mother and E.J.M. were accompanied by Mother's boyfriend and

aunt, in violation of the prohibition against Mother exposing E.J.M. to overnight visitors of the opposite sex. Father testified about the two Wednesdays on which E.J.M. did not come to his home as scheduled. He also recounted the incident in which Mother telephoned him to consult regarding E.J.M.'s failing grades, he responded by suggesting that E.J.M. stay with him, and Mother reacted by cursing him. At the end of the conversation, Father said, he could hear E.J.M. in the background protesting what Mother had said about Father, and then Mother hung up. Father confirmed that E.J.M. was indeed doing poorly in school and said that joint custody was not working in light of Mother's refusal to co-parent. He noted that, despite the fact that he paid Dr. Zinkus' fees, Mother had told him that she did not want to go back to see Dr. Zinkus. Father asked to be designated as primary residential parent.

Mother testified, partly in response to questions from the trial court and from Father's attorney. Mother asserted that the instances in which Father did not get his Wednesday parenting time arose because either she or the child were confused as to the day and the transition from the summer schedule. She confirmed that she failed to inform Father of the change in itinerary for the spring break trip or of the day trip from New York to Niagra Falls in Canada. Referee Michael indicated that he would enjoin Mother from having a boyfriend spend the night, either at the home or on a trip, in the child's presence, and Mother agreed. Father's attorney questioned Mother at length about each incident. In response to questions about her failure to consult with Father on the prescription of ADD medication and other matters, Mother did not dispute that she failed to consult with him, stating, ". . . [E]very time I discuss something with him he objects [and] we end up in court."

Finally, Father's wife testified. An elementary school teacher, she described working with E.J.M. at length on schoolwork, often making up assignments that were missed or late during E.J.M.'s stay with Mother.

At the end of the hearing, Referee Michael told the parties that, in light of the complicated history of the litigation, he would take the case under advisement and issue a ruling in several days. Meanwhile, the child would remain with Father while the Court reviewed the record and considered the testimony and evidence.

On December 13, 2005, Referee Michael issued a recommendation that Father's August 12, 2005 petition for custody and for contempt be dismissed, and the recommendation was approved by the Juvenile Court Judge. The order states that Father's petition for custody was dismissed "because the issue of custody in this matter is on appeal with the Tennessee Court of Appeals," and because Father had already received temporary custody of the child by virtue of the November 18, 2005 order. On December 19, 2005, without further hearings, Referee Michael issued a recommendation that Father's petition for a protective custody be dismissed. This recommendation was confirmed as well. On December 20, 2005, again without further hearings, Referee Michael found that "all matters pertaining to said child are within the jurisdiction of the Tennessee Court of Appeals . . . ." The amended order reiterated that Father's petition for a protective custody order was to be dismissed. Custody of E.J.M. was returned to Mother. The order did not include an injunction

against Mother having a boyfriend overnight in the child's presence. This order was approved by the Juvenile Court Judge.

On December 20, 2005, apparently unaware that the Juvenile Court had entered the December 19 and 20 orders, Father and the GAL filed a joint motion requesting that the Juvenile Court issue findings of fact and conclusions of law, and seeking a ruling in open court regarding the court's findings. This joint motion was set for a hearing on February 9, 2006. On January 10, 2006, Father appealed the December 20 dismissal of his petition.

The February 9, 2006 hearing was held as scheduled. On that date, Referee Michael read his findings and recommendations from a prepared text and declined to entertain questions or hear argument, emphasizing that the hearing was only for a ruling in open court. At the outset, Referee Michael indicated that he had reviewed and digested the entire file of litigation between the parties, not simply the pleadings and evidence pertinent to the most recent dispute:

> This Court is intimately familiar with the facts in this case as the litigation has continued for over ten years, with the filing of no less than 30 actions for specific relief in over 20 Orders, four appeals, two of which are currently pending. It is instruct[ive] to note that the litigation filed to date – that of the litigation filed to date, the mother has filed five actions, all of which concern child support. The father has filed 25 actions, the vast majority of which allege contempt against the mother, and a request for custody of the minor child.

Referee Michael then summarized the various petitions, motions, orders and appeals filed. He cited caselaw indicating that, once a notice of appeal has been filed, the jurisdiction of the appellate court attaches and the trial court loses authority to act in the case without leave of the appellate court. Referee Michael observed that Father had filed "numerous actions" in the Juvenile Court requesting custody "after filing notices of appeal to the Court of Appeals to challenge decisions that awarded custody to the mother;" all were filed "without leave of the Appellate Court." He then stated:

> The sheer volume and timing of the father's pleadings, the nature of the allegations contained within, and the father's inability to prevail in the majority of his actions lead this tribunal to conclude that the father's actions border on an abuse of the judicial process.
> The father's relentless approach to resolving this matter through litigation indicates an extraordinary vigilance of minor infractions of the custodial parent, and an unbending bias against cooperation.

Referee Michael reiterated that Father's latest petition for custody was "dismissed for lack of jurisdiction." He added, "Parties are prohibited from filing any further actions for custody, pending either a ruling from the Court of Appeals or by their leave." Juvenile Court Referee Herbert Lane, appointed as Special Judge, confirmed Referee Michael's recommendation. Appeal 2 is Father's appeal of the Juvenile Court's rulings on December 13 and 20, 2005, and February 9, 2006.

-10-

## ISSUES ON APPEAL

In Appeal 1, Father contends that the Juvenile Court Referee Woods erred in finding that the appellate court decision prevented him from designating Father as primary residential parent, and erred in ordering only joint custody with Mother as the primary residential parent, rather than designating Father as the primary residential parent.

In Appeal 2, Father raises several issues. First, Father contends that Juvenile Court Referee Michael erred in holding that, in light of the pending appeal, the Juvenile Court did not have jurisdiction to address Father's most recent petition for custody. Father contends that Referee Michael also erred in enjoining the parties from filing any additional petitions for custody while the latest appeals were pending, and in failing to grant Father's petition to be designated as primary residential parent. He argues that Referee Michael's characterization of Father's repeated petitions as "border[ing] on an abuse of the judicial process" is erroneous, and that he also erred in failing to include in his order an injunction prohibiting Mother from having a boyfriend stay overnight in the child's presence.

Because both Appeal 1 and Appeal 2 involve the issue of the parameters of the trial court's authority to entertain a petition for custody in light of an appeal involving custody, we address that issue first. We then address the other issues raised on appeal.

## ANALYSIS

### Jurisdiction

We consider first the issue raised in Appeal 1 and Appeal 2, namely, the extent of the trial court's authority to consider a petition for custody in light of an appeal concerning custody. The issue of the trial court's jurisdiction to hear a petition for custody is a question of law, which we review *de novo*. **Button v. Waite**, 208 S.W.3d 366, 369 (Tenn. 2006).

As noted by Juvenile Court Referee Michael in the February 9, 2006 hearing, upon the filing of a notice of appeal, jurisdiction over the case attaches to the appellate court, and the trial court loses jurisdiction over the matter that is the subject of the appeal. **First Am. Trust Co. v. Franklin-Murray Dev. Co.**, 59 S.W.3d 135, 141 (Tenn. Ct. App. 2001). The decree which is the subject of the appeal "is final and conclusive upon all the facts and conditions which existed and upon which the decree was made." **Smith v. Haase**, 521 S.W.2d 49, 50 (Tenn. 1975 (quoting **Hicks v. Hicks**, 176 S.W.2d 371, 375 (Tenn. Ct. App. 1943)). However, where the trial court has acquired continuing jurisdiction over the custody and welfare of a minor child, this continuing jurisdiction is not abrogated by the filing of an appeal. As we recognized in **E.J.M. I**, "events and lives have not stood still while [the initial] custody dispute has been in the courts." **E.J.M. I**, 2005 WL 562754, at *20 (quoting **Gorski v. Ragains**, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4 (Tenn. Ct. App. July 21, 1999)). "[A] change in circumstances which could justify changes in custody can occur at any time. There are times when a second petition for changes in custody may be filed and

heard by the trial court while the first petition is on appeal." ***Frey v. Meade***, 8 T.A.M. 27-13 (Tenn. Ct. App. May 16, 1983).  This Court has stated:

> . . .[T]he appeal of a dissatisfied parent does not tie the hands of a Trial Judge and prevent his continued concern and protection of a ward of the court pending appeal. . . .  Such an appeal does not transfer to the distant appellate court the continuing supervision of the welfare of the child.  Pending appeal, the day to day supervision of [the child's welfare] must be left to the Trial Judges. . . .

***Mittwede v. Mittwede***, 490 S.W.2d 534, 536 (Tenn. Ct. App. 1969).  Thus, if there are new facts and changed conditions since the decree, the trial court may issue any orders necessary for the welfare of the minor child, based on the new circumstances.  ***See Smith***, 521 S.W.2d at 51.

In the case at bar, the Juvenile Court acquired continuing jurisdiction over E.J.M. by virtue of the original paternity action.  ***See E.J.M. I***, 2005 WL 562754, at *1 (Tenn. Ct. App. Mar. 10, 2005).  Our decision in ***E.J.M. I*** was "final and conclusive upon all the facts and conditions which existed" at the time of the order that was the subject of that appeal.  ***Smith***, 521 S.W.2d at 50.  The issuance of the appellate decision in ***E.J.M. I***, however, did not abrogate the Juvenile Court's continuing jurisdiction to issue orders addressing new facts and changed conditions which arose after the issuance of the order being appealed.  ***Id.*** at 51; ***Mittwede***, 490 S.W.2d at 536.

Therefore, although the hearing that is the subject of Appeal 1 took place shortly after issuance of the appellate decision in ***E.J.M. I***, Father's petition for a change in custody was clearly based on events that occurred after entry of the order being appeal in ***E.J.M. I***, namely Mother's actions related to the Ritalin, failing to consult with Father, and concealing medical information from Father.  Consequently, the Juvenile Court had full authority to grant Father's petition *in toto*, if warranted by the change in circumstances.

Similarly, in Appeal 2, Father's petition for custody was based on events that occurred after entry of the order that was the subject of Appeal 1, namely, Mother's trips taken with E.J.M., Father's missed Wednesday parenting time, and Mother's angry telephone remarks.  Accordingly, despite the fact that Appeal 1 was still pending at the time, the Juvenile Court had jurisdiction to hear Father's petition and grant the requested change in custody if it determined that these facts warranted such a change.

Therefore, to the extent that Juvenile Court Referee Woods held that the Juvenile Court did not have jurisdiction or authority to grant Father's petition for a change of custody in Appeal 1, this holding is reversed.  Likewise, Juvenile Court Referee Michael's dismissal of Father's petition for custody based on lack of jurisdiction in Appeal 2 is also reversed.

## Change in Designation of Primary Residential Parent

In both Appeal 1 and Appeal 2, Father contends that the Juvenile Court erred in failing to designate him as the primary residential parent, and he urges this Court to do so on appeal. We consider Father's arguments on this issue in the context of both appeals. In both, Father contends that events which occurred after the prior custody order constitute a material change in circumstances which warrant changing custody and designating him at the primary residential parent.

The standard of review on this issue is set forth in our Opinion in **E.J.M. I**:

We review the Juvenile Court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. **Kendrick v. Shoemake**, 90 S.W.3d 566, 570 (Tenn. 2002); **Hass v. Knighton**, 676 S.W.2d 554, 555 (Tenn. 1984); Tenn. R. App. P. 13(d). We review issues of law *de novo*, with no such presumption of correctness. **Kendrick**, 90 S.W.3d at 569-70; Tenn. R. App. P. 13(d). In cases regarding custody, the Juvenile Court has broad discretion because such "decisions are factually driven and require the careful consideration of numerous factors." **Morris v. Morris**, No. M2001-02275-COA-R3-CV, 2002 WL 31059222, at *2 (Tenn. Ct. App. Sept. 17, 2002) (quoting **Bah v. Bah**, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983)). The trial judge is in a position to observe the demeanor of the witnesses and to make determinations of credibility. **Id.** Therefore, the Juvenile Court's custody determination will be reversed only if it has abused its discretion. **Id.**

Custody orders are *res judicata* and cannot be modified unless there has been a material change in circumstances that makes a change of custody in the child's best interest. **Kendrick**, 90 S.W.3d at 570; **Blair v. Badenhope**, 77 S.W.3d 137, 148 (Tenn. 2002); **see also Woodard v. Woodard**, 783 S.W.2d 188 (Tenn. Ct. App. 1989). The "threshold issue" is whether a material change in circumstances occurred after the initial custody determination. **Blair**, 77 S.W.3d at 150. The Supreme Court has explained that "[t]here are no hard and fast rules" in making such a determination:

> While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." We note that a parent's change in circumstances may be a material change in circumstances for purposes of modifying custody if such a change affects the child's well being.

> *Kendrick*, 90 S.W.3d at 570 (citation omitted). Once it has been determined that a material change in circumstances has occurred, then the issue becomes whether a modification of custody is in the child's best interest, considering the factors enumerated in Tennessee Code Annotated § 36-6-101(a). *Id.* "The trial court must recognize a strong presumption in favor of continuity of placement." *Morris*, 2002 WL 31059222, at *2 (quotation omitted).

*E.J.M. I*, 2005 WL 562754, at *16. We look now at the factual findings and the trial court's assessment of the demeanor and credibility of the parties in both appeals.

In the hearing in Appeal 1, Juvenile Court Referee Woods heard testimony and argument on Mother's actions in taking E.J.M. to see psychologist Dr. Wilson and physician Dr. Adesoji, obtaining a prescription for ADD medication for E.J.M. and administering the medication to her, all without consulting or even informing Father, and in giving the medication to E.J.M.'s school to administer on Father's parenting days, in an effort to conceal from him the fact that E.J.M. was taking medication. After hearing Father's testimony and Mother's position *pro se*, Referee Woods concluded that Mother intentionally deceived Father about the fact that their daughter was on ADD medication, and that she endangered E.J.M.'s well-being by placing her on such medication without consulting or informing Father. He found that Mother's conduct was a sufficient change in circumstances to warrant designating Father as primary residential parent, although he did not ultimately do so because of a misconception about the effect of the appellate decision in *E.J.M. I*.[5]

Referee Woods' initial finding that Mother's conduct was a sufficient change in circumstances to warrant changing the designation of primary residential parent is fully supported by the evidence. Serious problems could have arisen if E.J.M. had had a medical crisis while in Father's care and he was unaware that she was taking medication. E.J.M. was placed in the difficult position of not being able to tell Father that she was taking medication. Regardless of Mother's reasons for her decisions, hiding from Father the fact that their child was taking such medication was simply wrong. Father, as E.J.M.'s parent, had a right to this information, even if it resulted in Mother being in court again or being prevented from acting on her beliefs about the cause of E.J.M.'s continued school difficulties. This constitutes a change in circumstances sufficiently material to justify a change in the designation of primary residential parent.

We look now at the hearing in Appeal 2 before Juvenile Court Referee Michael concerning Mothers' trips with E.J.M., Father's missed parenting days, and the angry exchange in E.J.M.'s presence when Mother telephoned Father to consult on deteriorating school performance. Initially, Referee Michael granted emergency protective custody to Father, based on the rather puzzling representation to the Court, apparently made by Father's counsel and/or the GAL *ex parte*, that

---

[5] It is curious, however, that Referee Woods stated that he felt "bound" by the appellate decision, and nevertheless ordered joint custody, when the appellate opinion emphasized that the record supported Juvenile Court Referee Herbert Lane's conclusion that the parents simply could not work cooperatively, that the constant power struggle between them caused the most harm to the child, and that it was therefore necessary to designate one parent or the other as the decision-maker. *See E.J.M. I*, 2005 WL 562754, at *22-*23.

E.J.M. was "dependent and neglected" because Mother was purportedly "neglecting" her education. In the subsequent hearing, Referee Michael heard an outline of the history of the case from Father's counsel, Father's testimony, Mother's *pro se* direct testimony and lengthy cross-examination by Father's attorney as well as the GAL. Commendably, Referee Michael then took the case under advisement for the express purpose of reviewing the extensive file and considering the most recent conflict in the context of the overall litigation. Because Referee Michael ultimately dismissed Father's petition to be designated primary residential parent on jurisdictional grounds, he made no factual findings on the events which gave rise to the petition. In his order, however, he left no doubt as to which party he viewed as being primarily responsible for the unending series of disputes. After hearing the parties' testimony and the lengthy examination by counsel, Referee Michael referred to Father's "relentless approach to resolving this matter through litigation" and his "extraordinary vigilance for minor infractions" by Mother. He then characterized Father as having "an unbending bias against cooperation" and said his "actions border on an abuse of the judicial process."

Giving due deference to the trial court's assessment of the demeanor and credibility of the parties, and his view of the most recent conflicts in the context of the overall litigation, we must conclude that Referee Michael's findings are also fully supported in the record. A review of the record corroborates Referee Michael's impression of Father's years of over-reliance on litigation and his dogged cataloguing of Mother's every failure and transgression. This results in barren ground in which to try to cultivate a cooperative parenting relationship, as well as increased pressure on E.J.M., who by now is surely aware that her simply recounting to Father the events on a vacation with Mother is likely to result in more litigation between her parents over her.

Thus, in this consolidated appeal, because of the unique procedures in the Juvenile Court, we are faced with a "trial court" below with differing views of the parties' relative culpability. One finds that Mother has crossed the line and that her actions to deceive Father may warrant designating him as primary residential parent; the other clearly points to Father's ceaseless litigation against Mother as preventing a cooperative parenting relationship. Both trial judges heard the parties testify and assessed their demeanor and credibility, both reached conclusions that are supported by the record.

Under these circumstances, although we have found that the trial court has jurisdiction to address fully Father's petitions, we decline Father's request that we designate him as the primary residential parent at this juncture. Instead, we must remand the cause to the Juvenile Court to determine this issue in light of our clarification of the trial court's jurisdiction to consider the latest of Father's petitions for custody. The Juvenile Court is affirmed on all other issues raised on appeal.

Therefore, we remand the case for the Juvenile Court to reconsider Father's petition. On remand, the Juvenile Court should take a comprehensive view of the case, including but not limited to consideration of the parties' longstanding pattern of non-cooperation, Mother's most recent deception of Father regarding the ADD medication, and Father's unremitting litigation. Implementation of any joint-custody arrangement in this case is discouraged. The Juvenile Court is also directed, on remand, to re-evaluate whether there is a continued need for the GAL, Dr.

Zinkus, and the apparatus of requiring the primary residential parent, whoever that may be, to consult with not only the other parent, but also the GAL and/or Dr. Zinkus on significant decisions.

In the meantime, the parties are enjoined from exposing the child to overnight visits by unrelated visitors of the opposite sex. All remaining issues raised on appeal are pretermitted.

Therefore, the Juvenile Court's decision to award joint custody in Appeal 1, Case No. W2005-02520-COA-R3-CV, is reversed. The Juvenile Court's decision to dismiss Father's petition for lack of jurisdiction in Appeal 2, Case No. W2006-00365-COA-R3-JV, is also reversed. The cause is remanded for consideration of the issues noted above. Costs of this appeal are assessed one-half to Appellant Lee Meyers and one-half to Appellee Sandra Brown, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE