IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 12, 2010 Session

## CHERYL LINGENFELTER KING v. MONTE JOE KING

**Appeal from the Chancery Court for Williamson County**
**No. 28791    Timothy L. Easter, Judge**

**No. M2009-01722-COA-R3-CV - Filed July 9, 2010**

In this post-divorce custody dispute, father asserts that the trial court erred in denying his petition to change custody and in granting mother's petition to relocate. We have concluded that the evidence does not preponderate against the findings of the trial court, and we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Monte Joe King, Franklin, Tennessee, Pro Se.

Joshua Lee Rogers, Franklin, Tennessee, for the appellee, Cheryl Lingenfelter King.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Cheryl Lingenfelter King ("Mother") and Monte Joe King ("Father") were married in 1993 and have two children, Wilson and Nolan, born in 1996 and 1998, respectively. Both children were born in Colorado. In May 1999, the Kings relocated to Tennessee for Father's employment. Mother and Father divorced in June 2003, and Mother was named the primary residential parent of the two children. Father had regular parenting time every other weekend from Friday evening through Sunday evening, and every Tuesday after school. Summers were divided equally in two-week intervals.

On January 15, 2009, Mother filed a petition to alter visitation and for permission to relocate with the minor children. Mother alleged that, despite aggressive efforts, she had

been unable to find employment in Middle Tennessee that would pay a "decent salary" and that she was in "dire financial need." Mother further alleged that she had been offered a position as a residential supervisor with The Family Tree, a not-for-profit organization in Colorado, with a starting salary of $45,000. According to Mother's petition, she had not previously earned more than $27,000 per year. Mother requested that the court grant her permission to move to Colorado with the minor children and that the current residential parenting schedule be altered in accordance with her proposed parenting plan.

Seven minutes after Mother's petition to relocate was filed, Father filed a petition to change custody. Father asserted that substantial changes had occurred in the minor children since the divorce:

3. Since the divorce, minor child W.K. has become less stable emotionally. W.K. has been placed on anti-psychotic medication and anti-depressant medication. Mother reports significant behavioral problems at home and the school reports significant behavioral problems at school.

4. Mother has systematically worked to alienate the bond between the Father and the minor children. For example, Mother has initiated seven complaints to the Department of Children['s] Services all which have been determined to be unfounded. These have resulted in interviews between department personnel and the children, and serve to alienate the relationship between the Father and children, and traumatize the children.

5. When in Father's care, W.K. exhibits some oppositional and impulsive behavior, but Father is able to manage this with normal parental warmth and structure. No significant behavioral problems have occurred under Father's care.

6. Father has a good relationship with both minor children, but the cumulative effect of the Mother's actions cause increase in behavioral problems, alienation from the father and unnecessary psychiatric treatment.

Father maintained that he was the parent most willing to foster a relationship between the minor children and the other parent and prayed the court to make him the primary residential parent. On February 3, 2009, Father filed a petition in opposition to Mother's request to relocate with the children setting forth allegations similar to those included in his petition to change custody. He asserted that Mother's proposed relocation "is in part or whole vindictive in that it is one further effort to minimize contact between minor children and Father."

In March 2009, Mother filed a contempt petition based on Father's alleged failure to pay one-half of the children's uncovered medical expenses as required under the parenting plan.

## The Hearing

The case was heard in June 2009. Mother testified that she and the children had moved into an apartment four and a half years earlier, after foreclosure proceedings were initiated on her house. Mother had a master's degree in counseling, and since the divorce, she had gone back to school to get post-graduate credit hours to become eligible for licensure in marriage and family therapy. At the time of the hearing, she was working toward getting her license.

Mother described her employment history since the divorce. She worked as an office manager while taking post-graduate classes. In December 2006, she launched her own counseling practice. While she earned $27,040 in 2006, Mother earned $5,235 in 2007, her first year in her own business. According to Mother's testimony, she had difficulty building up her counseling practice; at the time of the hearing, she described her practice as being "in sad shape." She had had few clients since August 2008 and had taken other jobs to supplement her income.

Mother testified that she had applied for employment or submitted resumes with approximately 171 employers in Tennessee. She had garnered only a few interviews and had not been offered any positions in Tennessee. Mother also applied for jobs in other states, including Florida, Illinois, Missouri, and Colorado. She was offered several positions out of state, including a position as a residential supervisor at The Family Tree in Colorado, a job paying $45,000 per year. Mother received this job offer in November 2008, and the prospective employer held the position open for several months. Mother was unable to accept the position because she had not yet received court approval through these proceedings. In early 2009, after the filing of Mother's and Father's petitions, Mother received an offer of employment at Shiloh House in Colorado as program coordinator for a school at a salary of $30,000 per year and benefits.

After the divorce, according to Mother's testimony, the children would come home from spending time with Father exhibiting signs of emotional distress: "just a lot of distress over how they were treated, how hurt their feelings were, how afraid they were of being disciplined, how rough they felt that [Father] was with them, and a lot of times would demonstrate how spanking was administered, how angry." Wilson, in particular, had problems with low self-esteem and aggression toward other children. Wilson reported to Mother that Father would call him names and make derogatory remarks about him and about

Mother. Because of her concerns about the children's welfare, Mother testified, she contacted the Department of Children's Services ("DCS") five times between 2003 and 2006. Mother testified about specific circumstances that precipitated her reports to DCS, including an incident when Wilson had bruising and blood in his urine after Father administered physical discipline.

Mother testified about psychological issues experienced by Wilson, including impulsivity, depression, and suicidal ideation. He was evaluated and diagnosed with ADHD, depression, and anxiety, and a psychiatrist had prescribed medications, which had become a point of contention between Father and Mother. Father felt the medications were harmful to Wilson. Mother testified that Wilson made a suicidal gesture in 2006 and another in December 2007. Mother felt that Father's refusal to give Wilson his depression medications when the child was at his house contributed to Wilson's suicidal ideations.

Dr. Jay Woodman, a clinical psychologist who began treating the King children in September 2006, testified. His current diagnostic impressions were that Wilson had attention deficit disorder, chronic depression, and anxiety and that Nolan had an adjustment disorder. According to Dr. Woodman's testimony, Wilson had gone through times when he was afraid of Father and did not want to spend time with him, but both children had become more comfortable around Father over the past year and a half, and Father had worked on addressing issues that were affecting the children. Dr. Woodman testified that Mother had been supportive of the children's relationship with Father, even at times when the children became upset with her for insisting that they see him. When asked about Mother's reports to DCS, Dr. Woodman stated that he would have reported to DCS under the circumstances described in the reports.

Scott Hines, a friend of Mother, testified about an incident when he picked Nolan up after a basketball game at Mother's request and Father approached him and behaved in what Mr. Hines considered a belligerent and angry manner.

Father's first witness was Dr. Joseph LaBarbera, a clinical psychologist who had evaluated the King family in July 2008 on a referral from a mediator. His report was introduced into evidence as an exhibit. While Dr. LaBarbera had met with each family member, he performed formal psychological testing only on the parents. On a measure of child management skills, Mother's and Father's responses "were overall about equal with regard to appreciation of the critical issues and knowledge as to what constituted adequate solutions." Father's responses "included several references to discipline and control that were sometimes inappropriate given the circumstances." In his lengthy report, Dr. LaBarbera reached the following conclusions regarding Mother and Father:

Although Mr. King tends to be somewhat narcissistic and controlling in his personal style, he is not seriously psychiatrically impaired.

Ms. King is probably depressed, or subject to intense episodes of depression, in response to current stressors, past un-worked through issues from her early years, or both.

Mr. King's parenting is often action-oriented, emphasizing responsibility-taking and making sure that important things get done–which is positive. However, he is also probably prone to excessive use of consequences and punishments as a means of influencing the behavior of the children.

Ms. King seems concerned more with the emotional life of her children. She is attuned to their personal discontents and has sought out help for them in this regard–which is positive. However, Ms. King has sometimes been ineffective in daily-life parenting, judging from a serious past problem in consistently getting the children to school on time.

I see no clear evidence to indicate that Mr. King has been physically abusive to his children, as Ms. King claims. Ms. King has been unsupportive to the children in making repeated unsubstantiated complaints to authorities as to abuse by the father.

Each parent is convinced that the other is a harmful influence on the children. Mr. King relates Wilson's poor self-directional ability to the mother's failure to provide sufficient structure and discipline. Conversely, mother links Wilson's expressions of self-dissatisfaction and emotional upset to his harsh treatment by the father. Although both views probably have some limited validity, each parent is exaggerating the negative impact of the other parent on the children.

Although he did not agree with Mother's actions in making reports to DCS, Dr. LaBarbera opined at the hearing that her motive was to protect the children, not to harm Father.

Rusty Longhurst, Father's friend, testified about his observations of Father's parenting style and relationship with the children.

Cathy Dibrell, a counselor at the children's school, testified about her impressions of Wilson's behavioral problems and the responses of Father and Mother. She felt that Father had better control over the children and acknowledged that she had probably encouraged

Father to seek custody. On cross-examination, Ms. Dibrell admitted that she was testifying about interactions that occurred about four years earlier.

Janice Duke, Wilson's teacher in the fifth grade (2007-2008), testified about the child's interactions with both parents and their styles of addressing his behavioral problems. She felt that Wilson needed more structure and that Father was more able than Mother to provide that structure.

Susan Surbaugh, a behavior intervention teacher employed by the school district who had worked with Wilson, also testified. She recalled Father pleading with Mother to work together for the child's benefit. On cross-examination, Ms. Surbaugh acknowledged that Mother was supportive of the behavioral interventions and that her last meeting with Mother was when Wilson was in the fourth grade (in 2007).

Donna Laurent, with DCS Child Protective Services, described her interactions with the King family, and the DCS records were admitted into evidence.

Father testified as to his recollection of the incidents of alleged abuse reported to DCS. He denied calling the children names or abusing them. Father explained his opposition to giving Wilson anti-depression medications, stating that the child gained significant weight on the medicine and expressed to Father his unhappiness about being "fat and weak." Father acknowledged that for a period of time he stopped administering the medications to Wilson when the child was at Father's home. He expressed his desire to be able to work amicably with Mother for the benefit of the children.

### Decision of trial court

After hearing all of the evidence, the trial court denied Father's petition for a change of custody "because the Court cannot find for the purposes of changing custody that an unanticipated, significant change of circumstance sufficient to change custody has been met by Respondent." The court further found that "what precipitated Respondent's Petition for Change of Custody was Petitioner's Petition to Relocate." As to Mother's petition to relocate, the court applied Tenn. Code Ann. §36-6-108(d) because the parents did not spend substantially equal time with the children and granted Mother's petition. The court found as follows:

> [B]ased upon [Mother's] testimony, as well as Exhibits 1 and 2,[1] that Petitioner's relocation to Colorado does have a reasonable purpose, and that

---

[1]Exhibits 1 and 2 list the in-state and out-of-state jobs for which Mother had applied.

specifically is employment for Petitioner; that there is absolutely no proof in the record that Petitioner's proposed relocation to Colorado poses a threat of specific and serious harm to either of these children; that Petitioner's relocation is not vindictive and that it is not intended to defeat or deter Respondent's visitation rights; that the motivation and intention of Petitioner relocating to Colorado is employment in a field of work that will eventually yield a better life for both Petitioner and the minor children; that all of the reasons for Petitioner relocating to Colorado are affirmative and not negative.

The court denied Mother's petition for contempt because it could not find that Father's conduct was willful. The court awarded Mother attorney fees for defending Father's petition to change custody.

On appeal, Father argues that the trial court erred in denying his petition for change of custody, in granting Mother's petition to relocate, and in assessing court costs against him regarding his petition for change of custody.

STANDARD OF REVIEW

We review the trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Where the trial court did not make findings of fact, we must "conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999). We "give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses." *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007).

ANALYSIS

Petition to change custody

It is well-established that, in order to modify a parenting plan to change the primary residential parent, the trial court must apply a two-part analysis: the court must find that "both a material change of circumstances has occurred and a change of custody is in the child's best interests." *Kendrick v. Shoemake*, 90 S.W.3d 566, 575 (Tenn. 2002). Tenn. Code Ann. § 36-6-101(a)(2)(B) is the relevant statutory provision as to what constitutes a material change of circumstance in the context of a custody change:

If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

As noted by the court in *Kendrick*, "'[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody.'" *Kendrick*, 90 S.W.3d at 570 (quoting *Blair v. Bandenhope*, 77 S.W.3d 137, 150 (Tenn. 2002)). Several factors to consider when making this determination are whether the change occurred after the entry of the order to be modified, whether the change was known or reasonably anticipated at the time of the original order's entry, and whether the change "'affects the child's well-being in a meaningful way.'"*Id.* (quoting *Blair*, 77 S.W.3d at 150).

In arguing that the trial court erred in denying his petition to change custody, Father asserts that his petition "was not given appropriate attention because of the trial court's erroneous assumption that such petition was a reaction to [Mother's] Petition to Relocate." While the trial court did find that Father's petition was precipitated by Mother's petition to relocate,[2] that finding concerning Father's motive in filing his petition is not pertinent to the determinative issue of whether there had been a material change in circumstance since the court's original custody decree. The court specifically found that there had been no material change in circumstance.

Father asserts that there was a material change of circumstance because Mother "created a harmful environment for the two minor children by her continual efforts to alienate and marginalize [Father] in the lives of the children evidenced by multiple unfounded complaints against [Father]." As evidence of this harmful environment, Father points to the older child's suicidal gestures and psychiatric issues as well as concerns expressed to him by school officials about Mother's capacity to provide the necessary structure for the children. Father cites Dr. LaBarbera's evaluation of Mother as indicative of significant psychological problems.

---

[2]The record contains conflicting evidence on this issue. Mother testified that Father learned of her desire to move in October 2008. Father points to evidence that he told Dr. LaBarbera in August 2008 that he wanted to seek full custody. Mother's petition to relocate and Father's petition to change custody were filed on the same day, January 15, 2009.

Dr. Woodman, the children's treating psychologist, opined that Mother's reports to DCS were justified, and Donna Laurent from DCS stated that Mother's reports were not inappropriate. Dr. Woodman also testified that Mother had been supportive of the children's relationship with Father, even during times when the children expressed a desire not to see him. Dr. LaBarbera opined at the hearing that Mother made the reports to DCS in order to protect the children, not out of any desire to harm Father. Furthermore, he did not believe that the children felt alienated from Father. It is also significant that the DCS reports occurred more than two years before Father's petition to change custody.

With respect to Dr. LaBarbera's psychological evaluation of Mother, Father focuses on his findings that Mother was clinically elevated on four scales. Father considers these findings relevant to Mother's parenting abilities, but Dr. LaBarbera's report does not support this theory. In fact, Dr. LaBarbera found that Mother and Father obtained roughly equivalent scores on tests of child management skills, although Father's responses suggested that he sometimes used inappropriately severe discipline. Dr. LaBarbera's report does not suggest that Mother's experiences of depression had resulted in a significant impact on her parenting of the children. As to Father's argument regarding the older child's psychological and behavioral problems, the record shows that the child had received psychiatric and/or psychological care for more than five years and had improved significantly at the time of the hearing.

Father also points to statements made to him by school officials encouraging him to seek custody of the children. This testimony relates to the time when Wilson was in the fourth or fifth grade; at the time of the hearing, Wilson was about to enter the seventh grade.[3]

Looking at the entire record, we cannot find that the evidence preponderates against the trial court's determination that there had been no material change in circumstance to justify a change in custody. Thus, we do not proceed to the best interest analysis.

### Petition to relocate

Tennessee has a statute that governs parental relocation, Tenn. Code Ann. § 36-6-108. There is no dispute in this case that, pursuant to the parenting plan incorporated in the divorce decree, Mother spent substantially more time with the children than did Father. Therefore, the relevant provisions are found at Tenn. Code Ann. § 36-6-108(d)(1), which

---

[3]Father attempts to explain his failure to take action to obtain custody at the time of these statements by referring to advice received from attorneys. We cannot consider this argument because there is no supporting evidence in the record.

states that the court must permit the primary residential parent to relocate with the minor children unless the court finds that:

> (A) The relocation does not have a reasonable purpose;
>
> (B) The relocation would pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or
>
> (C) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

The burden of proof is upon the parent opposing the relocation to establish one of these three grounds. *Clark v. Clark*, No. M2002-03071-COA-R3-CV, 2003 WL 23094000, at *3 (Tenn. Ct. App. Dec. 30, 2003). If the opposing parent cannot prove any of the three grounds, the relocation shall be permitted. Tenn. Code Ann. § 36-6-108(d). Father makes arguments under all three grounds to deny a petition to relocate.

*Reasonable purpose*

Father asserts that Mother did not have a reasonable purpose for her proposed move, which he describes as "a predetermined scheme to further marginalize [Father] in the lives of the children." In support of this assertion, Father cites Mother's reports to DCS, her alleged psychological instability, and a comment she made to Dr. LaBarbera that sometimes she thought she would "like to just run away with my kids" to resolve problems with Father. He also questions Mother's attempts to find a job in Tennessee.

This court has previously declined to adopt bright-line rules with regard to circumstances or factors that will constitute a reasonable purpose for a proposed relocation. *See Slaton v. Ray*, No. M2004-01809-COA-R3-CV, 2005 WL 2756076, at *2 (Tenn. Ct. App. Oct. 24, 2005). Rather, we recognize that such determinations are fact-intensive and require a thorough examination of the unique circumstances of each case. *Id.* This court has consistently held that a salary increase and opportunities for career advancement can support a finding of reasonable purpose. *See Dye v. Fowler*, No. M2006-01896-COA-R3-CV, 2007 WL 1515140, at *3 (Tenn. Ct. App. May 23, 2007) (citing *Roberts v. Roberts*, No. E2005-01175-COA-R3-CV, 2005 WL 2860199, at *6 (Tenn. Ct. App. Oct. 31, 2005) and other cases). Previous decisions have also cited the following economic factors: "the relative significance of the [pay] increase, the cost of living in the proposed location compared to the present location, the firmness of the job offer, opportunity for career advancement and economic betterment of the family unit." *Slaton*, 2005 WL 2756076, at *3.

The trial court found, based on Mother's testimony and the evidence concerning her job search and offers of employment, that her "relocation to Colorado does have a reasonable purpose." As Father points out, the trial court "chose to believe" Mother's testimony concerning her efforts to find a job in Tennessee and the offers she received in other states. The trial court is uniquely situated to assess witness credibility, and we find no reason in the record to reject the trial court's conclusion. Father cites the case of *Slaton v. Ray*, 2005 WL 2756076, a case in which the court found no reasonable purpose for the father's proposed move. *Id.* at *3. While Father emphasizes that the father in *Slaton* produced no evidence except his testimony as to his new job, the case turned on several factors, including the modest pay increase (75 cents an hour) and the absence of any basis for father's hope of career advancement. *Id.* Moreover, in the present case, Mother introduced an e-mail from Shiloh House concerning the terms of its offer of employment.

Father also argues that Mother could work as an office assistant making more money than she had been since trying to get her counseling practice off the ground. Mother testified that her previous position as an office assistant was no longer available. The trial court found that "the motivation and intention of [Mother] relocating to Colorado is employment in the field of work that will eventually yield a better life for both [Mother] and the minor children." Mother testified that counseling was her chosen field "that I have invested a great deal of money and time and education in, where my gifts are in, and that I believe that that will provide me more money than I could ever make as an office assistant." Mother testified that she needed to get counseling experience in order to obtain licensure, which would allow her to make more money, and that she had a colleague in Colorado willing to provide her with referrals. She further testified that she had a network of friends and professional colleagues in Colorado.

The job offer at Shiloh House about which Mother presented proof at the hearing paid $30,000 a year, more than the office assistant position she held in 2006, and also offered benefits, including health insurance. Father takes issue with the fact that this job was not the same job Mother intended to take at the time she filed her petition to relocate. At the time she filed her petition, Mother had a job offer from The Family Tree for $45,000 a year, but the job was eventually given to someone else. Mother should not be penalized for the loss of the first job opportunity because of the necessity of receiving court approval. *See Winans v. Winans*, No. M2004-02566-COA-R3-CV, 2006 WL 1865027, at *7 (Tenn. Ct. App. June 30, 2006) (mother lost job opportunity when trial court denied her petition to relocate; this court reversed and instructed the trial court to allow mother to relocate "provided the same or similar opportunity is still available").[4]

_____

[4]Father also makes the argument that "with the adjustment in child support as a result of the
(continued...)

As discussed above with respect to Father's petition, Mother's reports to DCS and Dr. LaBarbera's psychological profile do not support Father's argument that she was motivated by a desire to alienate the children from Father. In fact, the testimony of Dr. LaBarbera and Dr. Woodman indicate that Mother encouraged the children's relationship with Father. With respect to the comment about running away with the children, Dr. LaBarbera interpreted this as an expression of momentary frustration, not a genuine desire to take the children away from Father.

Looking at the record as a whole, we agree with the trial court's conclusion that Father failed to prove that Mother's proposed move lacked a reasonable purpose.

*Threat of serious and specific harm*

Under Tenn. Code Ann. § 36-6-108(d)(1)(B), the proposed relocation must pose "a threat of specific and serious harm to the child." Tenn. Code Ann. § 36-6-108(d)(2) gives a non-exclusive list of circumstances that constitute specific and serious harm. This court has previously interpreted this requirement as follows:

> The statute is triggered by *affirmative* findings rather than negative findings. In other words, *when examining the 'threat of serious and specific harm' to a child, see* Tenn. Code Ann. § 36-6-108(d)(2), *the trial court should look for proof of such a threat, rather than a lack of proof that there is no such threat.*

*Mann v. Mann*, 299 S.W.3d 69, 75 (Tenn. Ct. App. 2009) (quoting *Dunkin v. Dunkin*, No. M2002-01899-COA-R3-CV, 2003 WL 22238950, at *5 (Tenn. Ct. App. Sept. 30, 2003)).

Father argues that the following provision describing specific and serious harm applies in this case: "If the child relies on the parent not relocating who provides emotional support, nurturing and development such that removal would result in severe emotional detriment to the child." Tenn. Code Ann. § 36-6-108(d)(2)(D). In support of this argument, Father points to testimony from various witnesses concerning his positive relationship with the boys and to the psychological evaluation of Dr. LaBarbera. Father interprets Dr.

[4](...continued)
relocation, [Mother's] net income would actually be less than if she had taken a job for comparable money in Tennessee." Other than referencing the decrease in child support from $1365 a month to $803 a month, Father does not explain this argument or what he means by "comparable money." Mother presented proof that she had been unable to obtain a job in Tennessee comparable to those offered to her in Colorado. Child support is based upon the parents' income and the amount of time spent by the children in each household. Father's argument does not establish an absence of reasonable purpose with respect to Mother's proposed move.

LaBarbera's report as showing Mother "as significantly psychologically impaired, while revealing that [Father] has no significant psychological impairments." As discussed above, Dr. LaBarbera's report does not indicate any significant effect on the children as a result of either parent's psychological issues. None of the evidence relied upon by Father points to a likelihood of "severe emotional detriment" to the children as a result of Mother's proposed relocation.

As Mother points out, Dr. Woodman, the children's counselor, testified on the issue of whether Mother's proposed relocation posed a threat of specific harm to the children:

> THE COURT: Well, the law is if it poses a threat of specific and serious harm. That's what the law reads.
>
> DR. WOODMAN: I would not say that it [Mother's plan to relocate] poses a risk of specific and serious harm.
>
> THE COURT: Specific and serious harm.
>
> DR. WOODMAN: Right. I would not say that it's at that level currently.

Overall, the evidence does not preponderate against the trial court's finding that Mother's proposed relocation did not pose a threat of specific and serious harm to the children.

*Vindictive motive*

Tenn. Code Ann. § 36-6-108(d)(1)(C) provides that a parent's motive for moving is vindictive if "it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child."

Father's short argument on this point restates some of the same points made with respect to his previous arguments: "This is a mother who has deep seated feelings of intense anger and resentment . . . , and who has made repeated, unsubstantiated complaints to the authorities against the father, who stated she would 'like to just run away with my kids.'" As we addressed these arguments above, we consider it unnecessary to reiterate that analysis. Mother points out that her proposed post-relocation parenting plan (adopted by the trial court) allows Father almost the same number of visitation days as did the previous plan. Father would have regular parenting time with the children only one weekend a month during the school year, but would have five weeks during the summer. However, as Father points

out, the relocation gives him less opportunity to participate regularly in the children's school events.

As with the other grounds for disallowing a proposed move under Tenn. Code Ann. § 36-6-108(d)(1), Father had the burden of proof, and the evidence does not preponderate against the trial court's determination that there was no vindictive motive established.

## Attorney fees

The trial court ordered Father to pay Mother's attorney fees associated with defending against his petition for change of custody.

In arguing that the trial court erred in this award of attorney fees, Father again asserts that the trial court improperly concluded that Father's petition for custody was a response to Mother petition to relocate. As we have discussed this argument previously, we need not address it again.

Tenn. Code Ann. § 36-5-103(c) specifically authorizes the court to award reasonable attorney fees incurred in defending a petition for change of custody. Such decisions are reviewed under an abuse of discretion standard. *Huntley v. Huntley*, 61 S.W.3d 329, 341 (Tenn. Ct. App. 2001). A trial court abuses its discretion only when it applies an incorrect legal standard or when it reaches a decision against logic or reasoning that causes an injustice to the complaining party. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Under this standard, we are required to uphold the trial court's ruling "as long as reasonable minds could disagree about its correctness." *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007). Furthermore, "we are not permitted to substitute our judgment for that of the trial court." *Id*.

The court found no material change of circumstances to justify a change of custody, and we find no abuse of discretion with respect to the trial court's decision to award Mother her attorney fees on the petition to change custody.

Mother argues that the trial court erred in failing to award her attorney fees with respect to her petition to relocate. While Tenn. Code Ann. § 36-6-108(i) gives the trial court discretion to award attorney fees to either parent in a relocation case, we find nothing to indicate that the trial court abused its discretion in declining to do so in this case.

Mother further argues that she should be awarded her attorney fees on appeal pursuant to Tenn. Code Ann. § 36-5-103(c). We decline to award Mother her attorney fees on appeal.

CONCLUSION

Costs of appeal are assessed against Father, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE